WESLEY WARNER, PLAINTIFF IN ERROR, v. THE STATE
OF NEW JERSEY, DEFENDANT IN ERROR.

1. If an intoxicated person has the capacity to form an intent to take
life, and conceives and executes such intent, it is no ground for re-
ducing the degree of his crime to murder in the second degree, that
he was induced to conceive it, or to conceive it more suddenly by
reason of his·intoxication.

2. When the statutory intention to kill existed and the killing was un-
provoked by any cause adequate to reduce the degree of the crime to
manslaughter, the intoxication of the homicide at the time of the act
cannot affect the degree of the crime.

3. When the court had charged·that if there was a reasonable doubt of
the existence of any fact essential to constitute murder in the first
degree, such doubt must be resolved in favor of the defendant, it was
not error to refuse a request to charge that if there was a reasonable
doubt whether a particular fact, i. e., an intent to kill, existed because
of another particular fact, i. e., intoxication, the jury could not return
a verdict in the first degree.

4. The act of the jury in going to the place of the homicide during the
trial was irregular, but, inasmuch as the facts show that the defendant
in this case could not possibly have been prejudiced thereby, it does
not vitiate the verdict.

5. The reason for inquiring of the prisoner before judgment in capital
cases, if he has anything to say why sentence should not be pro-
nounced, has disappeared since prisoners have been permitted to have
counsel.

On error to the Burlington Oyer and Terminer.

For the plaintiff in error, *Charles E. Hendrickson.*

For the defendant in error, *Eckard P. Budd.*

The opinion of the court was delivered by

REED, J.    On September 18th, 1892, Wesley Warner
killed Elizabeth Peak. They had been illicitly consorting.
On the night of the 18th he was at the house of the girl's

parents. He had been drinking. During the evening he left the house, taking with him a butcher-knife.

He was next seen lying in the road by the two sisters of the girl and some young men who were accompanying the three women home. Warner rose from the ground, caught Lizzie and struck her with the knife, from which blow in a few minutes she fell dead. For this deed he was tried and convicted of murder in the first degree.

The noticeable assignments of errors are confined to three points.

The first concerns the refusal of the court to charge certain requests in respect to the effect of the intoxication of the defendant upon the degree of his criminality.

The first of these requests was the following : "That if the defendant was at the time in such a state of intoxication that his mind was incapable of premeditating the fatal blow with the intent to take life, and his reason was deprived of the power to think and weigh the nature of the act and the consequences of the act, then the offence committed cannot be more than murder in the second degree."

The court charged, generally, that "if the defendant was mentally capable of conceiving a design to take the life of the woman, and he did conceive such a design, and if you are satisfied that, in pursuance of a design thus conceived, he purposely inflicted the fatal blow, then he was guilty of murder in the first degree ; whereas, if you find that he was incapable, from the condition of his mind, of conceiving such a purpose, or that, in point of fact, he had not fully conceived such a purpose, and acted in striking the fatal blow, not from design, but from sudden and motiveless, or from uncontrollable, because drunken violence, then he is not guilty of murder in the first degree, but guilty of murder in the second degree."

In respect to the request already set out, the court remarked : " I decline to charge that he must have weighed the consequences of the act. If he intended to kill, whether he took into consideration all of the possible consequences of the act, I do not think is material."

Assuming that the theory upon which the request to charge and the charge was formed is correct, namely, that a degree of drunkenness which obliterates from the mind of a homicide all intention to take life, reduces the degree of the crime, I yet fail to see any error in the general language of this charge or in the response to the request. The point was clearly presented to the jury that the question was whether there existed a design to take life. This design involved the consequences of the act committed, in respect of the result of the blow, namely, whether the use of the knife was likely to kill. The request involved an irrelevant consideration. It included, also, a submission of the question of the ability of the defendant to apprehend what punishment would follow the killing.

There is an assignment, also, to the refusal of the judge to charge the language of a request framed as follows: "That if, upon the whole evidence, the jury have a reasonable doubt whether, at the time of the killing, defendant had, as the result of intoxication or its after effects, sufficient mental capacity to deliberately think upon and rationally determine to kill the deceased, they cannot find him guilty of murder in the first degree."

The response of the court was: "I have charged that the prisoner must have been able to form, and must have formed, a design to take life, which was not the result of mere sudden passion or of intoxication, and I refuse to charge otherwise."

Now, the court had already charged that "if there be, in regard to any fact, any condition of doubt in the mind of a juror of that character which has been described as reasonable doubt, * * * that doubt should be resolved in favor of the defendant." Then follows a full and accurate statement of the legal idea of the term "reasonable doubt."

The court is not obliged to reiterate the same idea in every possible lingual shape in which it may be framed in different requests.

Design to kill was a fact. A reasonable doubt of the existence of that fact might spring out of the drunkenness of

defendant, or out of any other circumstance or combination of drunkenness with other circumstances.

A charge that the defendant was entitled to the benefit of a reasonable doubt as to any fact the state was bound to prove, involved, necessarily, the proposition that if there was a reasonable doubt whether drunkenness deprived the defendant of this intent to kill, he could not be convicted of murder in the first degree.

The fourth request was as follows : " That though the jury should find that, at the time the blow was struck the defendant was not so drunk as to be incapable of forming the premeditated and deliberate intent to kill, yet if the jury, in considering the effects of his intoxication with all the other facts, should find that the purpose to kill the deceased, if any, was formed in passion or jealous rage, produced upon his mind excited by liquor, upon suddenly finding the deceased in company with another man on the road, then it would reduce the offence to murder in the second degree."

The fifth request was to the same purport. These requests were refused except as before charged.

The substance of these requests was that the jury should be instructed that a killing accomplished with the design to take life, uninduced by any provocation which would reduce it to the degree of manslaughter, could be reduced to murder in the second degree by the intervention of the partial intoxication of the offender.

The general proposition is that drunkenness is no excuse for crime. The reasoning upon which, in those states in which murder is distinguished by degrees, drunkenness is permitted to modify the degree of the crime, rests upon one requirement essential to constitute murder in the first degree. This requirement is the existence of actual, specific malice— of an actual intent to take life. Without this there is no crime in that degree.

Any condition of fact, whether drunkenness or other circumstance, which shows the non-existence of this kind of actual malice, is relevant, not as an excuse for crime, but as

showing that no statutory crime at all of the degree named was committed.

This is the theory upon which all the cases go which recognize drunkenness as an element in the ascertainment of the degree of murder. *State* v. *Johnson,* 40 *Conn.* 136; *S. C.,* 41 *Id.* 585; *Roberts* v. *People,* 19 *Mich.* 401; *Pigman* v. *State,* 14 *Ohio* 555; *Shannahan* v. *Commonwealth,* 8 *Bush* 463; *Jones* v. *Commonwealth,* 75 *Pa. St.* 403; *Commonwealth.* v. *Dorsey,* 103 *Mass.* 412.

It is to be remarked that these cases carry the rule no further than this.

In respect to murder in the second degree, it is said in *State* v. *Johnson,* 41 *Conn.* 585, that a conviction is supported by implied malice; and that, therefore, if a drunken man takes the life of another, unaccompanied with circumstances of provocation or justification, a jury will be warranted in finding the existence of malice, though no express malice be proved. Intoxication, which is itself a crime against society, combines with the act of killing and the evil intent to take life which necessarily accompanies it, and all together afford sufficient ground for implying malice.

This is the rule which has always obtained in respect to crimes requiring no specific intent, committed by drunken parties.

Although the drunken man may do a criminal act unintentionally, yet the intent to get drunk coalesces with the act and combines act and intent. 1 *Bish. Cr. L.,* § 400.

The exceptional immunity extended to the drunkard is limited to those instances where the crime involves a specific, actual intent. When the degree of intoxication is such as to render the person incapable of entertaining such intent, it is an effective defence. If it falls short of this it is worthless.

Now it is indisputable that the charge of the court as to the condition of mind necessary to fix upon the defendant the crime of murder in the first degree was entirely correct.

It is clear that the jury was instructed that the absence of that mental condition was a complete defence to the charge of

murder in the first degree. The jury found, therefore, that the defendant possessed the design or intent specifically required by the statute as construed by our courts.

The crime therefore existed, although committed by a man partially intoxicated.

The request involved the proposition that although all the elements of the crime existed, yet if one of the elements, namely, intent, was induced by voluntary drunkenness, this fact would modify the crime. The claim was that if this intent sprung into existence from the cause named, by reason of drink, it excused the crime in that degree. The proposition is excluded by the rule already mentioned, that when the crime is complete the influence of intoxication is an irrelevant matter.

This proposition also includes the following inconsistency: A man is assailed with some gross verbal indignity, and in passion kills his assailant. No matter how sensitive his temperament, how nervous his organization, he is guilty of murder; and, if he had the design to kill, of murder in the first degree. So a person who, induced by a jealous fury, forms and executes a design to kill the object of his jealousy, is guilty of murder in the first degree. The law takes no account of physical or mental organization, aside from irresponsible insanity, in palliation of his guilt. He may be sick, nervous or endowed with an abnormally jealous disposition; he may be exceptionally sensitive to impressions and unrestrainably impulsive. This counts for nothing if the design to kill exists. But the proposition is that voluntary drunkenness is to be accorded an efficacy as a shield from crime which is denied to the misfortune of congenital or inherited weaknesses. The request was correctly refused.

The second ground upon which error is assigned is in respect to alleged misconduct of the jury.

It appears from the printed book that during the trial the jury, in charge of an officer, walked out to the scene of the murder. Upon this fact coming to the attention of the court,

the matter was opened to defendant's counsel. The officers were examined, and the defendant, personally and by his counsel, waived any objection to the irregularity committed by the jury.

Upon motion for a new trial, the refusal of the court to grant a new trial upon this ground, was excepted to. Upon the argument, the limitation upon the power of a defendant in a criminal case to waive any error in procedure, was elaborately discussed. It was also insisted that the conditions surrounding the prisoner were such, that he was constrained to waive the irregularity.

I find nothing in the case that displays any illegal restraint, but if there had been such and the waiver should be swept away, it would not change the complexion of affairs. For while it was admittedly irregular for the jury to visit the place where the deed occurred unless under judicial orders, I find nothing in the fact of the visit which could have prejudiced the defendant.

The jury walked up the road, at the request of the foreman, till they came to a place where there was a small bush which had been mentioned as the scene of the homicide. Not a word was addressed to the jury by the officers. No third party was present. In about three minutes they moved on their return. There was no dispute in the case in respect to the topography of the place of the homicide, nor in respect to the presence of the bush. There was no question but that the defendant was sitting or lying along the fence behind or near the bush, when Lizzie and the party with her came up the road, and that he rose up upon their approach. There is no contention that the place seen by the jury was not exactly as described in the testimony.

Upon the question tried in the cause and submitted to the jury, namely, whether the defendant had the capacity to form a design and did form a design to kill, nothing that the jury saw could in any conceivable way have added to or diminished the effect of the testimony.

This case is radically different from that of *Deacon* v. *Shreve,* 2 *Zab.* 176.

That was an action for overflowing lands. Three jurors, at the solicitation of a friend of the plaintiff, inspected a spring, the situation of which was a material point in the cause. The jurors were accompanied by a brother of the plaintiff and by a witness and friend of the plaintiff, who conversed with the jurors about the matter. It was also probable that the jurors received pay for their visit. The verdict was properly set aside.

In the present case there was no solicitation by any person connected with the case and no conversation with the jury. The act of the jury was upon the casual request of the foreman, and its effect, as already remarked, could not have been injurious to the prisoner.

The rule which controls the court, in dealing with this class of irregularities, was declared by the Supreme Court in the case of *State* v. *Cucuel,* 2 *Vroom* 249. In that case a juror during the trial had visited his home with an officer. This being a capital case, the act of the juror was irregular. It appears also that one of the jurors went with an officer to an oyster saloon and heard a casual remark pass between third parties about the trial, and thereupon immediately left the place.

The court refused to set aside the verdict, remarking that, in its anxiety to protect the prisoner, it must not abandon the sure footing of common sense. The rule announced was that the misconduct must have been such as to warrant the belief that the fairness and propriety of the trial had been impaired.

This rule was restated in the case of *Titus* v. *State,* 20 *Vroom* 36, in which case the jury procured a magnifying glass to compare certain wooden fibres, adhering to the clothes of the murdered girl, with those of a wooden platform upon which the state contended the girl had been thrown down when she was violated.

Speaking upon this subject, Mr. Bishop says: "It does not follow from the mere fact of the misbehavior of one or

more of the jury, whether with or without the consent of the officer in charge, that their verdict will therefore be set aside on the application of the prisoner.   There is no general rule which can be given on this subject other than that if the misbehavior is of such a nature as may have been in its effects prejudicial to the prisoner, the verdict will be set aside; if otherwise, it will not be." 1 *Bish. Cr. Pro.*, § 999.

So, aside from the waiver of the irregularity, it was not such as to vitiate the verdict.

While I have considered this assignment of error because it was insisted upon with some persistence, and the assignment was not objected to, I do not perceive how the matter became properly the subject of an assignment in error.

No exception was taken to any action of the court in respect thereto during the trial, and no exception can properly be sealed to the action of the court in refusing a new trial.

The next ground upon which error is assigned is that the record fails to show that the court asked the prisoner, before pronouncing judgment, if he had anything to say why judgment should not be pronounced.

The use of this form of words appears to have attended the imposition of sentence in capital cases in England, and I think the formula has always been employed in this state in like cases.

The question is whether its absence from the record displays so injurious an error as should lead to a reversal of the judgment.

In the first place, it is to be remarked that while the books of criminal practice enjoin the use of these words in all capital cases, yet I have no knowledge of any British case in which a judgment has been reversed on the sole ground that these words did not appear in the record, aside from three cases of outlawry for treason.   *Batscomb's Case,* 3 *Mod.* 265 ; *Rex* v. *Geary,* 2 *Salk.* 630 ; *Rex* v. *Speke,* 3 *Id.* 358.

The reasons advanced for a reversal were that, in response to the query, the prisoner might have pleaded a pardon or have moved in arrest of judgment.   Those reasons at the

time, when the rule was thus recognized, were substantial. The prisoner in this class of cases was not permitted to have the assistance of counsel. That beautiful feature of British criminal jurisprudence which permitted a man indicted for the lightest misdemeanor to be defended by trained lawyers, and yet compelled the man indicted for forgery or murder to rely upon the fiction that the court was his counsel, continued until 1836. So that the objection which would operate to arrest the entering of judgment had to be stated by the defendant himself.

The privilege extended to the defendant under this condition of affairs was a substantial one, and, in reason, extended to all cases of felony.

Under the condition of affairs existing in this state, however, the reason for the form has entirely disappeared. The defendant is represented by counsel who needs no invitation to interpose any legal objection at any stage of the proceedings. Counsel know the occasion when it is proper to assert the right of the defendant, and so the query of the court, whether regarded as an instruction to the defendant as to his rights, or as an invitation to assert them, is an unmeaning ceremony.

In the present case it would have been ridiculously idle, for it appears that, after the rendition of the verdict, a rule to show cause why a new trial should not be granted was moved for upon grounds submitted to the court by defendant's counsel.

This motion was overruled. So, after this presentation of the grounds for a new trial, judgment was pronounced.

Where a defendant is represented by counsel, there exists no reason whatever for the inquiry and the law requiring it should cease with the reason.

The best-considered cases in this country adopt the view that where the defendant is represented by counsel, and especially where he has moved for a new trial, the interrogatory is unnecessary. 21 *Am. & Eng. Encycl. L., p.* 1070.

The remaining assignments do not call for special mention.

We find no error in the record, and the judgment of the Oyer and Terminer is affirmed.

*For affirmance* — THE CHANCELLOR, ABBETT, DEPUE, LIPPINCOTT, REED, VAN SYCKEL, BOGERT, BROWN, KRUEGER, SMITH.   10.

*For reversal*—None.