DAVID WILSON, PLAINTIFF IN ERROR, v. THE STATE, DEFENDANT IN ERROR.

1. A juror stated that he had formed an opinion, from reading the papers, that the prisoner ought to be hung, but that he had no prejudice against him and would not find him guilty if the state failed to prove his guilt. *Held,* to be no ground for challenge by the prisoner.
2. As between the two offences of murder in the second degree and manslaughter, voluntary intoxication cannot be a legitimate subject of inquiry. What constitutes murder in the second degree by a sober man is equally murder in the second degree if committed by a drunken man.
3. When the character and extent of a crime is made by law to depend upon the state and condition of the defendant's mind at the time, and with reference to the act done, intoxication, as a circumstance affecting such state and condition of the mind, is a proper subject for inquiry and consideration by the jury. If, by law, deliberation and premeditation are essential elements of the crime, and by reason of drunkenness or any other cause it appears that the prisoner's mental state is such that he is incapable of such deliberation and premeditation, then the crime has not been committed. Intoxication is a mere circumstance to be considered in determining the presence or absence of premeditation.
4. The trial court properly charged " that if, at the time of doing the act, the evidence showed that the defendant was so intoxicated that his faculties were prostrated and he was rendered incapable of forming a specific intent to take life, then, although it was no defence for crime, his offence may thereby be mitigated to murder in the second degree."
5. If the faculties of the accused are not so far prostrated by intoxication as to render him incapable of forming an intention to kill, the jury would have no right to find that, by reason of the intoxication, the intention to kill was not present.

On error to the Morris Oyer and Terminer.

David Wilson was convicted of murder in the first degree, in November, 1896, in the Morris county Oyer and Terminer, and sentenced to be executed.

On the trial Mr. Justice Magie charged the jury as follows:

The indictment in this case charges the defendant with the murder of Melinda Wilson, in this county, on the 6th day

of June last.   To support this indictment the state must prove the facts sufficient for that purpose by evidence beyond a reasonable doubt.   A reasonable doubt would exist when the judgment of the jury, after a careful review of all the evidence, finds itself unconvinced of the guilt of the prisoner. If such a doubt exists you are bound to give the benefit of it to the prisoner, but you are not bound to give him the benefit of anything but such a reasonable doubt.

Under this indictment there may be a conviction of any grade of criminal homicide established by the evidence.   If the evidence does not establish the guilt of a higher degree beyond a reasonable doubt, the defendant is entitled to the benefit of a reasonable doubt in that respect, and he should only be convicted of that degree of crime which the evidence establishes beyond a reasonable doubt.

To make out the case the state must have established by evidence beyond a reasonable doubt, first, the death of Melinda Wilson at or about the 6th day of June.   If the evidence is believed, and there is no contradiction of it, she was alive in the morning of that day.   About one o'clock she was found by her son lying with her head covered with blood, in what he describes as a pool of blood, she being still living.   Shortly after she was seen by other people, and Policeman Campbell stood by the door when she died.   She was found dead by Dr. Wright and by Dr. Douglas, the coroner.   If believed, and as I say there is no contradiction of this evidence at all, you may find her death proved beyond a reasonable doubt.

If you believe the evidence of the physicians who made the autopsy, there were wounds inflicted upon her head, fracturing her skull, producing an effusion of blood upon the brain and causing death.   If you believe that medical evidence, and there is no contradiction, her death was caused by wounds inflicted upon her head.

The state must further prove, by evidence beyond a reasonable doubt, that these wounds were occasioned, and therefore the death caused, by some acts of the defendant, in order to

sustain this charge against him. On that subject you have the evidence of Mrs. Stoutenburgh in respect to a quarrel between the two in the course of that morning, the quarrel occurring on the stoop of the house. As I have the evidence, she declares that the defendant made some threat, to which the deceased replied that she was not afraid; she would see people as she chose. He said that he knew she was not afraid; she was not afraid of God and he intended to send her to hell. She said she was not afraid, and, " If you do send me to hell you will have to go;" and he said, " No, I am afraid of God and I mean to save my soul." If you believe that evidence, it is important with reference to the condition of the defendant's mind and his attitude appearing towards the deceased.

The son of the deceased went to the house during the course of the morning and found the defendant in the kitchen. He had been there before, but I am directing your attention only to the occurrence then. You must consider all the other evidence, however. I do not mean to exclude from your consideration, but I am only calling your attention to the main points of the evidence. He asked a question about the deceased, and in his direct examination he said the reply of the defendant was that he did not know; that he, the boy, ought to know. On cross-examination he was asked the same question, and he said the defendant replied that she had gone out. Then the cross-examiner said to him:

"*Q.* When you testified awhile ago, you said, I asked him where was mamma; he said he didn't know; I ought to know."

Now, which is the truth of those two?

"*A.* He told me I ought to know.

"*Q.* Well, now, did he say to you, when you came in there and asked him where is mamma, did he say, ' I don't know, you ought to know ?'

"*A.* Yes, sir.

"*Q.* That is the truth, is it; how did you come to say, just now, he told you she had gone out ?

"*A.* I made a mistake, I guess; because anybody makes mistakes," &c.

You will observe that when he was asked about the mother, whatever response he made, he did not disclose the fact, which was a fact, that the mother was lying in the next room, then in a helpless condition from some injuries inflicted about her head. The boy went to the door and, looking through a crack, discovered his mother's body upon the ground. He broke down the door, saw her condition and ran to the police station.

Mrs. Stoutenburgh was told by the boy on the way what had occurred; she went upstairs and she saw, as she said, the defendant go to the door and try to pull it shut; she explained the difficulty of shutting it by the fact that the boy, in breaking the door down, had affected the lock and bolt in some way so that it would not go to; that the defendant saw her and told her to go back—"Go back, what was she doing there"—and then told her the deceased was sleeping, he standing at the door where she was lying on the floor; she was asleep, and that he did not want to wake her up.

You then have the evidence of the policemen. After being told of this occurrence, Morrison and Campbell went toward the house, and on the way were attracted to this man, the defendant, going in the West End Hotel. They followed him there. He was in the act of taking a drink, or had taken it, when Morrison told him that he wanted him and put him under arrest. At that time he told Morrison he had killed her and he was glad of it and would hang for it. Immediately after that, in connection with the same topic, he said "She would do more for him than for me," though he did not explain what he meant by that. He went to the house with Morrison, and at the house took Morrison to the door of this room, threw it open and said "There she is;" he told Morrison that he had done it with an axe; he went with Morrison into the kitchen, and said he did not know where the axe was, but, looking, found it behind the stove, and came

and gave it to Morrison, and at police headquarters, to which he was taken, he repeatedly said that he had killed her.

No contest by the counsel who have so zealously and ably defended the prisoner, under the assignment of the court, is made over these facts, and if you believe this evidence you may find proved that the death was occasioned by the defendant's act, beyond a reasonable doubt. Upon facts of this sort, if found by you as I have stated, the law presumes the killing to be a criminal homicide.

Criminal homicides in New Jersey are divided into two classes—murder and manslaughter. The presumption in the case of criminal homicide is that it is murder; to reduce the crime to the grade of manslaughter, the evidence must show a lack of what the law calls malice. Malice, as the law uses the term in defining these crimes, consists in the intent to do bodily harm. Intent to do bodily harm is malice. Manslaughter is a criminal homicide, but manslaughter is without intent to do bodily harm. Murder is a criminal homicide with malice—that is, with an intent to do bodily harm. Of course you know intent is an act of the mind which cannot be seen, but can only be inferred from the conduct and acts of the party. In this case if you find that the death of the deceased ensued upon blows struck with an axe upon the head with vigor enough to fracture the skull in the way the doctors have described, you may infer an intent to do bodily harm and therefore malice. That the criminal homicide is murder has not been rebutted in this case, and no contention is made that any verdict of guilty of manslaughter would be proper. So you may find that if the defendant did the act he is guilty of murder, the presumption of the law which remains uncontested, the evidence indicating no lack of malice, unless the evidence furnishes some defence.

It is contended in defendant's behalf that at the time he was intoxicated; that he had been drinking on the Tuesday previous to the Saturday when this thing occurred, and had continued drinking during the intermediate time. It is my duty to tell you, gentlemen, that intoxication willfully entered

upon furnishes no excuse for crime and no defence against the consequences which the law denounces against crime.

A criminal homicide, as I have stated, is presumed to be murder; the presumption is that it is murder in the second degree. To constitute murder in the first degree and to justify a verdict of murder in the first degree, the state must make out by proof beyond a reasonable doubt, such as I have described to you, those ingredients which distinguish murder in the first degree from murder in the second degree, and that requires me to instruct and you to understand the difference between those two degrees. It is unnecessary to define all the cases which, under our statute, constitute murder in the first degree. So far as this case is concerned it is quite sufficient to describe one class of them. That class consists of every killing of a human being, willfully, deliberately and with premeditation. That has been defined by our courts, in cases like that before us, as including such killings as are those with an intent to take the life of the deceased, not a mere intent to do bodily harm, but an intent to take the life of the deceased, an intent carried out willfully with deliberation and with premeditation.

As I have already stated, an intent is an act of the mind which cannot be seen by the human eye, and which we can only learn of by inference drawn from conduct, words and acts. So with reference to the intent with which these blows were struck, you may look at all the evidence you find establishing facts in this case—the fact of previous threats and the particular fact of the threat of that morning that he would send her to hell, in connection with all the conversation that I have detailed to you before. The use of the axe, if an axe was used, was likely to produce death; the repeated blows, if repeated blows were necessary as the doctors say, to produce the several wounds and fractures of the skull. From that and any other evidence you may determine with what intent the axe was used, and if it was an intent to take life shown by the use of that kind of weapon and by repeated blows, then, gentlemen, you may find such an intent as would

be naturally inferred from the acts, and that intent to be one to take life; and if you find it to be a willful intent, and deliberate from the threats of the morning, premeditated from threats before, then, gentlemen, you may find that the ingredients of murder in the first degree are hereby established.

But it is said in behalf of the defendant that he was so intoxicated that these ingredients of which I have spoken were not established and ought not to be found by you. This is not a defence put in by the defendant, because, as I have stated to you, intoxication, in no respect, is a defence for crime. It is an essential ingredient, as I have stated to you, of the crime of murder in the first degree, that there should be an intent to take life. Any intoxication may be considered with reference to the existence of that intent and its willful, deliberate and premeditated character, and I charge you that if, at the time of doing the act, the evidence shows you that this defendant was so intoxicated that his faculties were prostrated and he was rendered incapable of forming a specific intent to take life, which I have stated is an essential ingredient of this crime, then, although it is no defence and no justification for crime, his offence may thereby be mitigated to murder in the second degree. But I charge you, gentlemen, that in dealing with such a condition you ought to use great caution not to give immunity to persons who commit crime when they are inflamed by intoxicating drink. You must discriminate between the conditions of mind merely excited by intoxicating drink and yet capable of forming a specific intent to take life, and such prostration of the faculties as renders a man incapable of forming the intent.

Now, the proof is before you, and you must determine from this evidence whether the faculties of the defendant were thus prostrated so that he was incapable of forming this intent. It is said that he had been drinking. There is no question, from all the evidence here, that that fact may be inferred, but to what extent there is no evidence except the evidence of the defendant. Some witnesses think he was drunk; others did not notice that he was drunk, although

they did think he had been drinking.  The defendant says that he forgets what occurred; that his mind is a blank on that subject.  The defendant is a competent witness in his own behalf, and you must take his evidence into consideration.  You have the right, however, in determining what weight should be given to it, to remember the position in which he is placed and the interest he has in respect to the verdict which you may render, and you must first determine whether that story is truthful.  Immediately after the occurrence, if you believe the police officers, he told what he had done.  If that be so, had he forgotten it then?  Directly thereafter he told them the mode in which it was done and the weapon that was used.  Had he forgotten it then?  Directly after that he took them to and produced the weapon.  Directly afterwards, at the headquarters, he said that he had killed her.  If you believe, however, that he now forgets it, does that indicate that, at that time, his faculties were so prostrated that he was incapable of forming the specific intent to take life which you would otherwise infer from the use of the axe directed upon the head with sufficient force to fracture the skull with repeated blows?  If he was thus capable, intoxication was no excuse, for, although you may think that his excitement, by reason of intoxication, led him further than it would if he had not been intoxicated, the fact that he was capable of forming the specific intent is a fact that establishes the ingredient necessary to the crime of murder in the first degree.

Now, gentlemen, I have gone over this case with the utmost care, to give to the defendant the benefit of all that appears in this evidence.  I must now leave it in your hands.  Of course, if there is no evidence that satisfies your judgment, beyond a reasonable doubt, that the defendant committed this act, then your verdict must be for him, but if the evidence convinces your judgment, beyond a reasonable doubt, that the defendant took the life of the deceased, then, gentlemen, the presumption is that it was murder in the first or second degree, and he must be convicted of one of those degrees,

there being no evidence here which would reduce the crime to manslaughter. If the evidence convinces your judgment, beyond a reasonable doubt, that he had a willful, deliberate and premeditated intent to take the life of the deceased, then, gentlemen, it is murder of the first degree.

Are there any facts that I have omitted to state that counsel think desirable to be stated, or any facts which counsel think I have misstated?

If none I will pass to the requests to charge.

### REQUESTS TO CHARGE.

Defendant's counsel requests the court to charge as follows:

*First.* That if the jury believe from the evidence that the defendant, at the time of the commission of the crime, was, by reason of intoxication, unable to decide between right and wrong, they should not convict of murder in the first degree.

*Second.* That if the jury believe that Wilson, at the time of the killing, was, by reason of intoxication, unable to form a willful, deliberate and premeditated design, they should not convict of murder in the first degree.

*Third.* That while intoxication does not excuse crime, if it has been shown that Wilson was intoxicated to such an extent as to render him incapable of judging of the nature and quality of his act, the jury should find a verdict of murder in the second degree.

*Fourth.* That if the jury believe from the evidence that Wilson, at the time of the killing, was intoxicated to such an extent as to render him incapable of judging of his acts or their legitimate consequences, he should not be convicted of murder in the first degree.

*Fifth.* That in order to reduce the offence from murder in the first to murder in the second degree, it is not essential that Wilson should have been intoxicated at the time of the killing to such an extent as to have been totally unconscious of his acts.

The first request I decline, except as I have charged.

The second I decline, but in place of it I charge the first point in the Warner case, the case in the Court of Errors. This is the law laid down by that court: "If an intoxicated person has the capacity to form an intent to take life and conceives and executes such intent, it is no ground for reducing the degree of his crime to murder of the second degree, that he was induced to conceive it or to conceive it more suddenly by reason of his intoxication."

The third, fourth and fifth requests I decline to charge otherwise than as I have charged.

For the plaintiff in error, *Edward A. Quayle* and *Charles A. Reed.*

For the state, *Joshua S. Salmon.*

The opinion of the court was delivered by

VAN SYCKEL, J. The grounds relied upon for the reversal of the judgment in this case are:

*First.* The refusal of the trial court to sustain challenges to jurors.

*Second.* That in the foregoing charge to the jury, the court erred in its instructions in respect to the subject of intoxication of the prisoner at the time he committed the homicide.

The question in relation to the challenge of jurors is presented as follows:

"*Juror Peter Cook*, challenged to the favor, having been duly sworn, testified as follows:

" Direct examination by Mr. Quayle.

"*Q.* Where do you live?

"*A.* Budd's Lake.

"*Q.* Have you formed any opinion in this case?

"*A.* I have.

"*Q.* What is that opinion?

"*A.* Well, my opinion is he ought to be hung, according to the papers—what I have seen in the papers.

"*Q.* Well, do you think that evidence could convince you to the contrary if produced here on the witness-stand?

"*A.* Well, if they have got clean proof of it they might; then I might be convinced.

"*Q.* What do you think?

"*A.* Well, if they have got evidence enough to prove he is not guilty, why, then, of course I will have to go according to the evidence; but in my own mind I possess an opinion, according to the papers, that he ought to be hung.

"*Q.* And you have already given expression to that, have you? Would it take more than the ordinary amount of evidence, then, to convince you to the contrary?

"*A.* Well, I don't know really; it would have to be quite strong evidence to convince me anyway.

"*Q.* Quite strong?

"*A.* Yes.

"*Q.* Stronger than the ordinary amount of evidence?

"*A.* Yes, sir.

"*Q.* Have you any prejudice on account of his color?

"*A.* Not at all.

"*Q.* Or general appearance?

"*A.* No shape or manner.

"*Q.* That's all.

" Cross-examination by the prosecutor.

"*Q.* If the evidence on the part of the state should fail to prove the case against him, as it has been stated from which your impression has been formed, would you still feel as you do?

"*A.* Well, I don't know really how I could; if the state failed to prove him guilty, I could not fetch out a verdict that he was guilty.

"*Q.* Then you feel that you could consider the evidence that may be produced here and weigh it, and upon that evidence decide whether he is guilty or not?

"*A.* Yes, sir.

"*Q.* And if the state fails to prove the case against him,. you would not then feel that he should be convicted?

"*A.* Oh, no; no, I could not.

" The Court—The challenge is overruled."

Since the trial of the case of State *v.* Spencer, it has been the accepted law of this state that it is not a ground of principal challenge to a juror that he has expressed an opinion on the matter to be tried, if it was not done through malice or ill-will.

In that case, reported in 1 *Zab.* 196, Chief Justice Hornblower says: "A declaration of opinion to disqualify a juror, therefore, must be such an one as implies malice or ill-will against the prisoner, thereby showing that the person challenged does not stand indifferent between the state and him."

This declaration was approved without any qualification by our Supreme Court, in an opinion delivered by Chief Justice Green, in *State* v. *Fox,* 1 *Dutcher* 566.

This question was again raised in *Moschell* v. *State,* 24 *Vroom* 498, and the rule adopted in the cases above cited was inflexibly adhered to.

We are of opinion that the practice in this respect, which has so long prevailed in our courts, is well founded and wise,. and that no departure from it should be sanctioned.

The juror challenged in this case disclaimed malice or ill-will, and there is nothing in his examination which rendered him subject to a successful challenge, and it was therefore properly overruled.

The language in the charge of the court, to which exception is taken, is: "It is an essential ingredient, as I have stated to you, of the crime of murder in the first degree that there should be an intent to take life; any intoxication may be considered with reference to the existence of that intent and its willful, deliberate and premeditated character, and I charge you that if, at the time of doing the act, the evidence shows you that this defendant was so intoxicated that his faculties

were prostrated, and he was rendered incapable of forming a specific intent to take life, which I have stated is an essential ingredient of this crime, then, although it is no defence and no justification for crime, his offence may thereby be mitigated to murder in the second degree."

There is no rule of the English common law more firmly settled than that voluntary intoxication does not excuse or palliate crime.

Lord Coke, Sir Matthew Hale, Sir William Blackstone and Lord Bacon unite in pronouncing the law of England to be " that such a person shall have no privileges by his voluntary contracted madness, but shall have the same judgment as if he were in his right senses."

The cases of *Rex* v. *Carroll*, 7 *Car. & P.* 145, and *Rex* v. *Meakin*, *Id.* 297, show how rigorously the rule was adhered to. In the former case, Mr. Justice Park and Mr. Justice Littledale declared that if it were to be considered law, that the fact of a defendant being intoxicated is a proper circumstance to be taken into consideration on the question of premeditation, there would be no safety for human life.

The statement that voluntary drunkenness is no excuse or justification for any crime is too firmly established by a long series of cases, both in England and in this country, to be now a subject of controversy.

The apparent confusion upon the subject, which is introduced by the decisions in some of our states, arises in a measure from an inaccurate statement of the position intended to be assumed by the court.

When the English courts declared that voluntary intoxication was an aggravation of the offence committed, they did not intend to assert that a criminal act committed by a drunken man constituted a higher crime than the same act committed by a sober man. It was an expression used to emphasize the rule that voluntary intoxication did not excuse.

In my examination no case has been found sustaining a contrary view.

The true rule, in my judgment, to be deduced from a mass of authorities, is that there is a situation in which the fact of drunkenness is entitled to weight, not as an excuse for crime nor in extenuation of it, but as a fact tending to show that the crime imputed was not committed.

When the character and extent of a crime is made by law to depend upon the state and condition of the defendant's mind at the time, and with reference to the act done, intoxication, as a circumstance affecting such state and condition of the mind, is a proper subject for inquiry and consideration by the jury. If, by law, deliberation and premeditation are essential elements of the crime, and, by reason of drunkenness or any other cause, it appears that the prisoner's mental state is such that he is incapable of such deliberation and premeditation, then the crime has not been committed; there is a failure on the part of the state to prove the crime into which premeditation must enter.

Intoxication is a mere circumstance to be considered in determining whether premeditation was present or absent.

As between the two offences of murder in the second degree and manslaughter, voluntary intoxication cannot be a legitimate subject of inquiry. What constitutes murder in the second degree by a sober man is equally murder in the second degree if committed by a drunken man. *People* v. *Rogers,* 18 *N. Y.* 9; *State* v. *Tatro,* 50 *Vt.* 483; *State* v. *Johnson,* 40 *Conn.* 136; *State* v. *Mowry,* 10 *Crim. L. Mag.* 23, and the numerous cases cited in the notes to that case.

In the Warner case, which was affirmed in this court, the trial judge charged the jury that if the defendant's mind, by reason of intoxication, was in such a condition that he could not conceive the purpose of taking life, he was guilty only of murder in the second degree. *State* v. *Warner,* 27 *Vroom* 686.

In State *v.* Martin the defendant was charged with homicide and tried in the Essex Oyer and Terminer in 1881.

Mr. Justice Depue charged the jury as follows on the subject:

" If the evidence is sufficient to satisfy the jury that the intoxication of the accused, at the time of the homicide, was so great as to prostrate his faculties and render him incapable of forming the specific intent to kill, which is the essential ingredient of murder of the first degree, the prisoner will not be entitled to acquittal, but his offence will be murder in the second degree. You should carefully discriminate between that excitable condition of the mind produced by drink, which is not incapable of forming an intent, but determines to act on a slight provocation, and such prostration of the faculties by intoxication as puts the accused in such a state that he is incapable of forming an intention from which he shall act." 4 *N. J. L. J.* 339 (1881).

This case was taken by writ of error to the Supreme Court and the judgment there affirmed in November, 1883.

As observed by the learned judge in the Martin case, this rule should be applied with caution, that no undue or dangerous immunity or license be given to crime by persons whose passions are inflamed by drink.

So long as the mind of the criminal is capable of conceiving the purpose to kill, he must be held to the responsibility of one who is sober, and that is the language of the cases upon this subject.

In *Marshall* v. *State*, 59 *Ga.* 154, Mr. Justice Blakely said : " To be too drunk to form the intent to kill, the slayer must be too drunk to form the intent to shoot."

This utterance was cited with approval in *Hanvey* v. *State*, 68 *Ga.* 614.

If the faculties of the accused are not so far prostrated by intoxication as to render him incapable of forming an intention to kill, the jury would have no right to find that, by reason of the intoxication, the intention to kill was not present.

In the case submitted, the trial judge charged the jury in the language of the court in the Martin case, and in that respect there was no error.

The judgment below should be affirmed.

GARRISON, J. (dissenting).    The question upon which this court is divided is whether the intoxication that may be considered by the jury upon the degree of murder must be such as rendered the defendant incapable of forming an intention to kill, or whether it may be such as satisfies the jury that, as matter of fact, such an intention did not exist.

The trial judge adopted the former of these views, and charged the jury that the intoxication that might be considered with reference to the existence of premeditation was a condition of the defendant in which "his faculties were prostrated and he was rendered incapable of forming a specific intent to take life." This view has been, in almost identical language, embodied in the opinion that speaks for the majority of this court.

I think that the other view is the correct one, and that upon the question of degree the issue was whether, as matter of fact, the defendant had formed a specific intent to take life, and not whether he had proved that he could not have formed it. The burden of proving the defendant's guilt and the *quantum* of such proof were in nowise shifted or varied by the introduction of the defendant's testimony as to his intoxication. The fact of intoxication was merely an added circumstance which, if proved by the weight of evidence, should have been considered by the jury in connection with the question of intent, the burden of proving which beyond a reasonable doubt was on the state.

Such "a reasonable doubt," as was said in the case of *State* v. *Warner*, 27 *Vroom* 686, "might spring out of the drunkenness of the defendant." And it must be apparent to every mind that there are states and stages of intoxication that would excite the gravest doubts as to the existence of deliberation and a premeditated purpose, and yet would not warrant the conclusion that the formation of such a purpose was beyond the capacity of the individual. To deny this efficacy to the defendant's testimony was to do him a legal injury. And in this connection it should be borne in mind that intoxication

is not a defence as insanity is, and hence the doctrine of Graves' case does not apply.

But apart from this, the effect of the substitution of the mental capability of the defendant for his actual mental state was an injurious shifting of the issue. By its indictment and by its proof the state said to the defendant, "You formed a specific intent to take human life." To this the direct and obvious traverse is, "I did not," and upon this issue all relevant testimony would be considered. But if the only answer permitted to the defendant were "I could not," a totally different issue was presented, and the defendant was denied all benefit from the testimony going to show that "he did not," unless he also proved that "he could not."

A yet more fundamental injury to the defendant in thus shifting the issue was that it relieved the state from the burden of proving premeditation beyond a reasonable doubt and compelled the defendant in that respect to prove his innocence beyond all doubt. That this was the practical and logical effect of requiring the defendant to prove that his faculties were so prostrated that he was incapable of premeditation is clear. For if, in addition to proving by weight of evidence the fact of his intoxication, he must also, by like proof, satisfy the jury that the state of mind engendered by this fact was one that rendered him incapable of premeditation, he must establish by preponderance of proof the negative of that which the state was bound to prove beyond a reasonable doubt; and if he thus proved that he could not have formed the specific purpose ascribed to him, it followed beyond all doubt that he did not form it.

Briefly outlined, these are the considerations that constrain me to dissent from the majority of my brethren.

The only case in this court that has been cited gives strong support to the view for which I contend. I refer to *Warner* v. *State,* 27 *Vroom* 686.

In the Warner case, which was affirmed in this court, the trial judge charged the jury that "if the defendant was mentally capable of conceiving a design to take the life of the

woman, and *if he did conceive such a design*, and if you are satisfied that, in pursuance of a design *thus conceived*, he purposely inflicted the fatal blow, then he was guilty of murder of the first degreee; whereas, if you find that he was incapable, from the condition of his mind, of conceiving such a purpose, or that *in point of fact he had not fully conceived* such a purpose, then he is not guilty of murder of the first degree." See citation made by Mr. Justice Reed in his opinion, 27 *Vroom* 687. The distinction thus made was carried into the abstract of his opinion by the careful justice who prepared it. See the syllabus, *Id.* 686. "If an intoxicated person has the capacity to form an intent to take life *and conceives* such intent, it is no ground for reducing the degree of his crime to murder of the second degree, that he was induced to conceive it or to conceive it more suddenly by reason of his intoxication." And in the body of the same opinion the general answer to the defendant's assignments of error is that "the point was clearly presented to the jury that *the* question was whether *there existed* a design to take life."

In the case of *Marshall* v. *State*, 59 *Ga.* 154, it is impossible from the opinion to tell what question was before the court, or how it arose. The only reference to a record is contained in the judicial declaration, "The record which the counsel has brought to us drips with blood." Under this sanguinary influence, the law, with respect to intoxication, is thus announced: "The degree of drunkenness shown by the evidence * * * was not great, but had it been the *utmost possible degree consistent with the power of discharging a pistol*, the law of the transaction would have been the same." I am unable to see how the power to discharge a pistol becomes a test of the formation of a specific intent to take human life; but the proposition logically paves the way for the general rule with which the opinion concludes, viz., "To be too drunk to form the intent to kill, the slayer must be too drunk to form the intent to shoot." I cannot join with the court that, in *Hanvey* v. *State*, 68 *Ga.* 614, "cited this utterance with approval."

In Martin *v.* State (New Jersey Supreme Court of November Term, 1883), no opinion is reported or on file, but, inasmuch as error was not assigned upon the charge of the trial court with respect to the effect of intoxication, the propriety of the charge in that respect could not have been judicially considered, and hence was not affirmed.

In the well-considered case of *Haile* v. *State,* 11 *Humph.* 154, the precise point is discussed as the psychological question that it is, and the judgment of the trial court was reversed because of a charge substantially identical with that now before us. The conclusion there reached was that "the degree of drunkenness that may shed light on the mental state of the offender is not alone that excessive state of intoxication which deprives a party of the capacity to frame in his mind a design deliberately and premeditatedly to do an act. All murder of the first degree must be perpetrated willfully, deliberately, maliciously and premeditatedly. The jury must ascertain, *as a matter of fact,* that the accused *was in this state of mind* when the act was done."

I have not found an authority that shakes the soundness of this conclusion, and my attention has not been directed to any line of reasoning that tends to the opposite result.

I am authorized by the Chancellor, and by Justices Dixon, Lippincott and Collins, to state that they concur in the views here expressed.

*For affirmance* — DEPUE, GUMMERE, LUDLOW, VAN SYCKEL, DAYTON, HENDRICKSON, NIXON. 7.

*For reversal*—THE CHANCELLOR, COLLINS, DIXON, GARRISON, LIPPINCOTT. 5.