MURRY *v.* STATE.

4408                                    194 S. W. 2d 182

Opinion delivered April 29, 1946.

Rehearing denied May 27, 1946.

*Alston & Woods,* for appellant.

*Guy E. Williams,* Attorney General, and *Earl N. Williams,* Assistant Attorney General, for appellee.

SMITH, J. Informations were filed against Joe L. Scott and C. H. Murry, in one of which they were charged with the offense of assault with intent to kill; in the

other with the crime of robbery. In one information it was alleged that the defendants had assaulted one Verner Andrews with the intent to kill the said Andrews. In the other information it was charged that the defendants had robbed Andrews of certain personal property.

By consent defendants were tried upon both informations at the same time, and were found guilty of the offense of assault with intent to kill, but were acquitted upon the other charge. Sentence was pronounced on the verdict against Murry, from which he has appealed. Sentence against Scott was suspended to permit him to rejoin the army.

The testimony is to the effect that Murry and Scott had been honorably discharged from the army, and were returning to their homes. As they approached Texarkana, there was a collision between the automobile in which they were driving and another car, which resulted in damage to that car. An unsuccessful attempt was made to settle the damage, but the owner of the damaged car insisted that they drive into Texarkana, where the damage might be appraised. The request was not approved by Murry and Scott and they attempted to elude the driver of the damaged car, and in doing so they drove into a tourist court operated by Andrews, driving over a sidewalk where there was no driveway, and stopped their car in a space not intended for that purpose.

The owner of the damaged car followed into the tourist camp, where the argument about the damage was resumed. Andrews heard the commotion, and called the police department, and as he left his office to see what the commotion was about, he picked up and put in his pocket a blackjack, and as he left his office he was assaulted by Murry who struck him in his eye. Andrews drew the blackjack from his pocket, and struck Murry with it, and Scott came up behind Andrews and knocked him down. Both defendants jumped on Andrews, took his blackjack away from him, and began beating him with it, and carried Andrews through a side door into his office where they asked him for his money. He pulled

loose from the men and started to run, when one of them knocked him down with the blackjack. When he arose his head was pummeled against the wall until it bled profusely. When he liberated himself he got a shotgun and returned to the encounter, where his gun was taken away from him, and the beating was resumed. He was carried into the kitchen of the camp and again beaten with the blackjack, and Murry told him he was going to have to pay off. Andrews asked what they wanted, and one of the assailants said they wanted $50. Andrews produced the money, when Scott suggested that they had better not leave him there, as someone might have their license number, so they took Andrews and put him in their car where there was a drunken man, an acquaintance of the defendants, who had been picked up by them to prevent the arrest of the drunk man, as they explained. When the four men were all in the car, Scott started to drive off. Andrews got out of the car when Scott said to Murry, ''Give me the blackjack. Let me hit him a few licks.'' Andrews testified that they took his wrist watch off of him, and while they were struggling to put him back in the automobile the sheriff and his deputy arrived.

The fourth man who remained in the car was in a drunken stupor, and had no part in the affray, if indeed he was aware of what was going on.

Andrews was badly beaten. He received wounds to his tongue, head and eyes, and the scars on his head were visible at the time of the trial. When he was carried to the hospital six stitches were taken in his head, and one in his tongue. His eye was bloodshot for several days. There were blood spots on the wall against which his head had been beaten. There is a scar in the shape of a ''Y'' on the left side, near the center of his head and a long scar down the side towards the ear, about three inches long and one on the back of his head about one inch long. All the scars were the result of the attack and Andrews was confined to the hospital about nine days.

When the shotgun was taken away from Andrews it was placed in defendant's car, and they explained that this was done, not to shoot Andrews with it, nor to steal

it, but to prevent Andrews from shooting them. Undoubtedly both Scott and Murry were under the influence of intoxicating liquors, but it is not contended that either was so drunk that he did not know and realize what he was doing.

The testimony is sharply conflicting, but we have given Andrews' version, as we are required to do, in testing the legal sufficiency of the testimony to support the verdict. Murry and Scott testified that they offered to pay $10 in satisfaction of the damage done to the car they had struck, and when the owner of that car refused the offer, they attempted to elude him, and in speeding away the hood of their car blew off, and they ran into the court of Andrews' tourist camp. The man whose car they had struck soon appeared, and a settlement of the damages was effected, and their pursuer drove away. While the settlement was being negotiated Andrews appeared and ordered defendants away. Murry testified that he said, "Wait until we pay for the fender, and we will get out." Andrews went into one of the rooms of his court, and according to the version of defendants, reappeared, and without provocation, assaulted Murry with his blackjack. It is admitted that Andrews struck Murry with the blackjack, which is conceded to be a lethal weapon. Indeed the defense is that the assault upon Murry with the blackjack, referred to as a deadly weapon, so infuriated Murry that an irresistible passion was aroused and that this provocation for the admitted assault upon Andrews operated to reduce the degree of their offense from an assault with intent to kill, to an aggravated assault.

Defendants denied any intention either to kill, or to rob, Andrews. They denied taking the watch off of Andrews' person, which was later found near their car. They admitted putting Andrews' shotgun in their car, but said this was done to prevent its use. Defendants contend that the lack of any intention to kill Andrews is shown by the fact that they did not kill him which might have been done with either the blackjack or the shotgun.

Murry testified that when he was unable to settle for the damage to the car they had struck, he thought it

would be funny to run away and not pay anything, and proceeded to do so, and only drove into Andrews' court because the hood of their car had blown off. They admitted that they attempted to put Andrews into their car, but stated their purpose in doing so was to turn him over to the officers of the law, because of the assault that he had committed on them.

The sheriff testified that when he drove up he saw evidence of the fight and told defendants they had beaten Andrews unmercifully, when Murry said he "wished he had killed the son-of-a-bitch." The defendants may not at any time have had the intention of killing Andrews, but we think it was a question of fact whether this was their intention when they assaulted and beat him. They denied any intention of robbing Andrews, and testified that they told him they did not want his money when he offered them $50 to leave him alone.

Murry admitted saying he was sorry he had not killed Andrews, but it is insisted that this was mere fighting talk, inspired by anger and resentment. It is designated as an extra-judicial confession which, standing alone, is not sufficient to prove the specific intent essential to constitute the offense of an assault with intent to kill.

The case of *Davis* v. *State,* 115 Ark. 566, 173 S. W. 829, is cited to support this contention. There a woman who had shot her husband remarked to the officer who had placed her under arrest that she was sorry she had not killed her husband. It was said in the opinion in that case that: "The essential ingredient of the crime under the plain language of the statute, cannot be proved by the confession of the defendant not made in open court, unless there is also other proof of such specific intent (to kill). In other words, under our statute, if there be no proof of the specific intent to take life except the extra-judicial confession of such intent, then the offense of assault with intent to kill is not established, and if this were the only proof of such intent, the accused would be entitled to an acquittal of that offense."

Here, however, this remark is by no means the only proof of the specific intent to kill Andrews, who was assaulted with a weapon admittedly capable of causing death, and Andrews was beaten in a manner which might well have produced that result. We conclude, therefore, that the testimony is legally sufficient to support the finding that a specific intent to kill Andrews existed.

The court gave numerous instructions fully and clearly declaring the law of the case, to the following effect: That to sustain a conviction it was essential that the jury find "that there was present in the minds of defendants at the time said assault was made a specific intent to take the life of the said Andrews" and further that the circumstances of the assault must have been such that had death resulted from it, the defendants would have been guilty of murder in either the first or second degree. The court also gave instructions numbered III, IV and VIII, at the request of the defendants, reading as follows:

### No. III

"You are instructed that if you find that the defendants assaulted Verner Andrews with the intent to kill him, but that said intent arose without malice and as a result of a sudden heat of passion, brought about by a provocation apparently sufficient to make the passion irresistible, then the defendants would not be guilty of assault with intent to kill, but would be guilty of aggravated assault or of assault and battery, depending upon whether or not a dangerous or deadly weapon, instrument or thing was used by the defendants in making such assault."

### No. IV

"You are further instructed that if you find from the evidence beyond a reasonable doubt that the defendants assaulted Verner Andrews without provocation or by reason of slight provocation with a dangerous or deadly weapon, instrument or thing with intent to inflict grievous bodily harm upon him, but without any specific intent to kill him, then you may not convict the defend-

ants of an assault with intent to kill, but you may convict them of aggravated assault. You are further instructed in this connection that if you have any reasonable doubt on the question of whether the defendants intended to kill the said Verner Andrews when they assaulted him, if, in fact, you find that they assaulted him at all, you are bound to give the defendants the benefit of said doubt and acquit them of the crime of assault with intent to kill."

### No. VIII

"You are instructed that if you find from the evidence that the defendants, at the time they assaulted Verner Andrews, if in fact they did assault him, were in such a drunken or intoxicated condition that they were unable to formulate any specific intent to kill him, you may not convict the defendants of assault with intent to kill."

We think these instructions declared the law as favorably to defendants as they had the right to demand. Other instructions were asked, amplifying the declarations of law above set forth, but we think those given fully covered the subject, and it was not error therefore to refuse the additional instructions.

One of the instructions requested, which was refused, presents a question which requires consideration. It reads as follows:

### No. IX

"You are instructed that in determining whether the assault, if any, committed upon Verner Andrews by the defendants, was malicious or was caused by a sudden heat of passion brought on by a provocation apparently sufficient to make the passion irresistible, you may consider whether or not the defendants were drunk or intoxicated to a degree whereby their passions were more easily inflamed or aroused than would have been the case had they been entirely sober."

In the excellent brief of counsel for appellant, it is conceded that no case was found which supports the

instruction, and we think there was no error in refusing it.

In the case of *State* v. *Treficanto*, 106 N. J. L. 344, 146 Atl. 313, the defendant was convicted of murder in the first degree. He admitted the killing, but interposed the defense that he was too drunk to form and entertain the specific intent to kill, and he insisted therefore that the grade of the offense was thereby reduced. In overruling this contention the Court of Errors and Appeals of New Jersey said: ''Counsel for defendant Treficanto cites in support of his contention the case of *Wilson* v. *State*, (1897) 60 N. J. L. 171, 37 A. 954, 38 A. 428, and says that in that case the court laid down the rule: 'If the evidence is sufficient to satisfy the jury that the intoxication of the accused, at the time of the homicide, was so great as to prostrate his faculties and render him incapable of forming the specific intent to kill, which is the essential ingredient of murder of the first degree, the prisoner will not be entitled to acquittal, but his offense will be murder in the second degree.' This is to be found at page 185 of 60 N. J. L. (37 A. 958), and is an excerpt from the charge of Mr. Justice DEPUE in *State* v. *Martin*, in the Essex oyer and terminer in 1881; affirmed in Supreme Court 1883. It is pertinent to remark that the learned justice proceeded further to say: ' "You should carefully discriminate between that excitable condition of the mind produced by drink, which is not incapable of forming an intent, but determines to act on a slight provocation, and such prostration of the faculties by intoxication as puts the accused in such a state that he is incapable of forming an intention from which he shall act." 4 N. J. L. J. 339 (1881).' Mr. Justice VAN SYCKEL wrote the opinion in *Wilson* v. *State*, and he went on to say, at page 185 of 60 N. J. L. (37 A. 959): 'As observed by the learned judge in the Martin case, this rule should be applied with caution, that no undue or dangerous immunity or license be given to crime by persons whose passions are inflamed by drink.' And, further: 'So long as the mind of the criminal is capable of conceiving the purpose to kill, he must be held to the

1070

responsibility of one who is sober, and that is the language of the cases upon this subject.' "

It is conceded that appellant was not too drunk to form the specific intent to kill. On the contrary, it is specifically conceded that "there is no question at all of appellant having reached that state of drunkenness." If this be true, and it is conceded to be, the appellant is not to be excused because he was under the influence of intoxicants. It is a matter of common knowledge that many of the most atrocious and deliberate crimes are committed by persons more or less under the influence of intoxicants, indeed in many instances, the intoxicant is used to supply the necessary fortitude to commit the criminal act, and if appellant was not intoxicated to the extent of being incapable of having the specific intent to kill, the fact that he was intoxicated, but in a less degree, is no defense.

The judgment must, therefore, be affirmed and it is so ordered.