STATE OF NEW JERSEY, RESPONDENT, v. BUFORD
TANSIMORE, DEFENDANT-APPELLANT.

Argued December 12, 1949—Decided January 23, 1950.

518

Mr. *Isidor Kalisch* argued the cause for appellant (*Mr. Jerome B. Litvak,* attorney).

Mr. *Duane E. Minard, Jr.,* argued the cause for the State (*Mr. Edward Caulkin* and *Mr. C. William Caruso* on the brief).

The opinion of the court was delivered by

WACHENFELD, J. The appellant appeals from a conviction of murder in the first degree. The trial jury not having returned a recommendation of life imprisonment, the death penalty was imposed under the statute.

The fatal shooting occurred on Sandford Avenue in the City of Newark in the early morning of September 4, 1948. The defendant does not deny the shooting of Nettie Waters, which was abundantly proven, but asserts he had no recollection of it and contends if he is guilty of any offense, it is only murder in the second degree or manslaughter.

Buford Tansimore is fifty-two years old. He lived in Newark and then moved to East Orange, where he first met Nettie Waters early in 1936. They went around together for three or four months, became intimate, occupied the same bedroom and this arrangement continued even after the deceased's daughter and her baby moved into the apartment. The baby was later taken to the defendant's mother's home in Virginia and he contributed toward her support.

The parties continued to live together up to October, 1946. The defendant was a good provider. He purchased furniture and many things for the home and bought clothes, dresses, fur coats and a limited amount of jewelry for the deceased.

The defendant's health was not of the best and he was confined to the Beth Israel Hospital in 1939 to undergo a surgical operation for a lung abscess.

In 1943 disagreements cropped up between the parties and, as a result of a conversation with a friend of his, the defendant began to follow the deceased and found her going with another man. This occurred on a number of occasions and ultimately an altercation took place between the defendant and a man named Downer in which blows were exchanged. The deceased promised reformation, admitting she had been on familiar terms with Downer and unfaithful to the defendant. This, according to his story, had a most depressing and upsetting effect upon him, causing him to lose his appetite and become extremely nervous and destroying his ability to work

for about three and a half months. During this period he was taken care of by the deceased's daughter.

In 1944 Tansimore and the Waters woman purchased a house in East Orange, both contributing, and she lived there until September, 1948. In 1945 the defendant went into the general contracting business but in 1946 Downer again appeared upon the scene and proved to be the same disturbing element. The defendant's health was again adversely affected and despite the pleas of the deceased he moved elsewhere. There were a number of distressing incidents and she was accused of stealing money, which resulted in complaints to the local police department, but despite these difficulties the defendant and the deceased saw each other daily. She, in the meantime, attempted to persuade him to forget their differences and resume living together. She repaid certain sums of money to him, which does not seem to be disputed. The intimate relationship continued up to the fatal day.

Early in September the defendant made inquiry of the deceased's daughter as to where she and her mother were going over Labor Day and was informed they would not accompany him on his contemplated trip to Virginia as they were going to North Carolina and she thought her mother was going there with one Arthur Hall. When he met the deceased he repeated his invitation with respect to the Labor Day trip, without avail.

On September 3rd the defendant drank quite heavily and again visited the deceased and asked whether she would go to Virginia with him, which she refused to do, saying that if she wasn't good enough for the defendant to live with, then she wasn't good enough to go to Virginia with him.

That night he went to the house of Rowlett, a friend of his, brought some whiskey with him and drank to a considerable extent. He told Rowlett he wanted to trail his girl friend because she was going away and Rowlett agreed to accompany him with his car on this errand. The defendant drove his own automobile to the garage, picked up a revolver and some shells and put the gun inside his shirt where it was not visible. Rowlett first drove to the deceased's place of employ-

ment and found it closed. They then went to the deceased's home but her car was not there so they journeyed on to her garage and finally located her car on Olcott Street facing Central Avenue.

They secured and imbibed in more liquor and then the defendant slept while his friend watched the deceased's car until one A. M. The defendant felt sick and expressed his intention to go home but was persuaded by Rowlett to take another nap. He was awakened later and informed that people were coming out of the house. He saw the deceased cross Olcott Street with five other people carrying some baggage.

Rowlett and the defendant followed the deceased's car and after some time the defendant told Rowlett to close in, which he did, by cutting off her car and forcing it to stop. The defendant got out, walked back to the deceased's car, while Rowlett drove on to the next intersecting street, where he waited. In a moment he heard shots. Then the defendant returned, opened the door and got into the car. When asked as to what happened, the defendant said, "Oh, nothing happened. I just wanted to see—I only done that to scare the people." He told Rowlett to take him home.

As a matter of fact, when Tansimore left Rowlett's car, he walked swiftly to the decedent's car, had his hand on his belt and demanded, "Everybody get out." Mocile Lassiter and the decedent both got out of the car and stepped on the sidewalk and as they did the shooting began. Six shots were discharged. There was no conversation between the defendant and the decedent excepting the order to get out of the car.

The deceased was wounded by five or six bullets, all of them entering either from the side or from the back. One wound was in front and near the lobe of the left ear surrounded by considerable powder smudge. This bullet entered the skull, passing backward and upward, penetrating the brain, and was classified as fatal. The second bullet passed through the left arm, entered the chest on the left side and continued to cross the chest in a slightly forward direction, piercing the heart after passing through the right lung. This wound was also fatal. The third wound was below the arm pit in the

right chest, while the fourth was in the back, the bullet going through her skirt slightly to the left of the mid-sacral line. It penetrated the intestines and was also fatal. The fifth bullet was in the back of the head. It took an upward direction. There was also a wound called a defense wound between the index and the little fingers of the left hand.

There was testimony that the bullets extracted from the decedent's body were fired from a gun found on the defendant at the time of his arrest.

The defendant claimed on the night in question he followed the deceased simply to determine whether she was being good and he carried the loaded gun for protection. He denied memory of the killing although he told in great detail everything up to the moment of it and said the deceased struck him in the mouth and from that point on he remembered nothing until he found himself in his Cadillac automobile in New Brunswick on the way to Virginia.

The defendant's history showed he suffered from syphilis for many years and following the lung operation in 1939 he attempted suicide. Dr. Perlman was produced as to his attempted suicide in 1939, Dr. Maisel as to his syphilitic condition and Dr. Brodkin as to his lung operation. Dr. Bergman, a specialist in neurology and psychiatry, testified as to an examination made of the defendant following his attempted suicide. Dr. James B. Spradley, an eminently qualified specialist in the diagnosis and treatment of nervous and mental diseases, testified in answer to an hypothetical question the defendant's mental processes were so prostrated during the period of the deceased's assault upon him that the defendant did not have the capacity to form an intent and to deliberate murder.

There was no attempt to acquit the defendant of the charge made against him but counsel's endeavor was to reduce the degree of homicide to either second-degree murder or manslaughter.

Twelve different points are raised on the appeal and will be considered in the order presented.

First it is contended there was error when the court charged:

"The distinguishing feature between murder of the first degree and murder of the second degree is the intent with which the homicide was committed. In first degree murder there must be an intent to take life; in second degree murder the intent need merely be to do grievous bodily harm."

The appellant asserts deliberation and premeditation are the real distinguishing features between murder in the first degree and murder in the second degree and not the intent to take life as recited above. He relies upon *Wilson v. State,* 60 *N. J. L.* 171 (*E. & A.* 1897), and *State v. Mangano,* 77 *N. J. L.* 544 (*E. & A.* 1909), where Justice Parker said:

"It is therefore settled in this state that murder in the first degree cannot be predicated on the mere existence of an intent to kill at the time of committing the crime. * * *

"It should be evident, from what has been said, that an intent to kill carried out, does not constitute murder in the first degree unless coupled with the premeditation and deliberation prescribed by the statute, and which, as we have seen, require time—not a long time— not necessarily an hour or a minute, as was said in the Donnelly case [*Donnelly v. State,* 26 *N. J. L.* 463] * * *."

Appellant argues murder in the first degree has three requisite elements and that the State must establish and prove it was willful, premeditated and deliberate. We have no quarrel with this thought but the record indicates the court with clarity, simplicity and force charged that the murder was presumed to be in the second degree and:

"If the State proposes to raise the criminal responsibility for an unlawful homicide from murder in the second degree to murder in the first degree it must accept the burden of proving beyond a reasonable doubt that the killing was a wilfull, deliberate, and premeditated killing, as set forth in the statute defining murder in the first degree."

The court also clearly and carefully defined "willful, deliberate and premeditated" in the exact language approved many times by our courts of last resort and concerning which no complaint is made here. In his charge the trial judge used the word "premeditated" seven times, the word "deliberate" six times and the word "willful" three times. The court in part charged:

"Normally, premeditation comes first; that is, an entertainment by the mind of a design to kill, followed by deliberation, the weighing of considerations *pro* and *con* as to whether the design shall be carried into effect, after which the killing, being determined upon and carried out, it becomes wilfull, deliberate, and premeditated in the sense intended by the statute. No particular length of time need intervene between the formation of the intent, the purpose to kill, and its execution. It is not necessary that the deliberation and premeditation should continue for an hour or for a minute; it is enough that the design to kill be fully conceived and purposely executed. If the design is found to exist, even though it is executed in a very short space of time, that is sufficient under the law. Deliberation and premeditation, while they must exist, need not be long. If the killing is wilfull, deliberate, and premeditated, it is murder in the first degree, even though no special motive is shown."

A reading of this portion of the charge, coupled with the paragraph preceding it already set out in this opinion, illustrates the lack of merit in the appellant's argument that it failed to explain the statutory elements of first-degree murder.

In determining whether or not error was committed, a single sentence may not be extracted and construed without regard to the context of the entire charge. *State v. Banusik,* 84 *N. J. L.* 640 (*E. & A.* 1906). The court cannot state the law of the case in a single sentence and the charge must be read as a whole in the light of a sensible construction to determine its legal worth. *State v Tachin,* 92 *N. J. L.* 269 (*Sup. Ct.* 1919); affirmed, 93 *N. J. L.* 485 (*E. & A.* 1919). Although certain sentences in a charge taken alone may need some amplification to render them accurate, yet if such amplification be given in the context so that the jury cannot be misled, there is no error justifying reversal. *State v. Frank,* 90 *N. J. L.* 78 (*Sup. Ct.* 1917); affirmed, 91 *N. J. L.* 718 (*E. & A.* 1918). Viewed with these principles in mind, the charge was full, fair, accurate and in accord with the recognized authorities cited many times in murder cases.

Both before and after the particular sentence criticized, the court repeatedly instructed the jury before it could convict of murder in the first degree it was essential to find the defendant willfully, deliberately and with premeditation killed the deceased. It scrupulously directed consideration should

be given to all of the facts and circumstances and left it to the jury to determine the question of guilt or innocence and the degree of murder, if any:

"Under this indictment and the law of our State there are five possible verdicts returnable: first, guilty of murder in the first degree; second, guilty of murder in the first degree with a recommendation of life imprisonment; third, guilty of murder in the second degree; fourth, guilty of manslaughter; or, fifth, not guilty."

We see no error in the court's charge in the respect complained of.

Point II is alleged error in the failure to charge the defendant's request No. 19 in this language:

"The State must prove beyond a reasonable doubt that the killing in this case was wilfull, deliberate and premeditated. If any one of these essential elements is missing, you cannot convict the defendant of first degree murder,"

the argument advanced being the jury was not informed that the absence of one of these three necessary ingredients would reduce the offense to one lower than first-degree murder.

██ ██ The court need not charge in the exact language requested and, if the subject matter of the request has been charged and fully covered by the court, there is no error. It is not the right of the defendant to choose the language in which the court should state to the jury the pertinent instructions to which the defendant is entitled. *State v. Juliano,* 103 *N. J. L.* 663 (*E. & A.* 1927).

Although the court here did not adopt or use the identical phraseology submitted in the request to charge, it fully covered the subject referred to completely and accurately in the main charge. After dwelling upon the burden of proof and the question of reasonable doubt and calling the jury's attention to the presumption in law that the killing was murder in the second degree, the court said that if the State proposed to raise the criminal responsibility of the defendant from murder in the second degree to murder in the first degree:

"* * * it must accept the burden of proving beyond a reasonable doubt that the killing was a willful, deliberate, and premeditated killing, as set forth in the statute defining murder in the first degree."

The court specifically pointed out that each of the elements involved must be proved, which was the plain import of the request submitted:

"The defendant in this case, as are defendants in all criminal cases, is presumed to be innocent, and unless the crime charged and the degree of crime charged and each and all of its elements are proved beyond a reasonable doubt, he is entitled to be acquitted. He cannot be convicted of any crime or degree of crime unless he is proved guilty thereof beyond a reasonable doubt, and the burden of proving the guilt of the defendant and the degree of his guilt beyond a reasonable doubt rests upon the State throughout the entire case, and never shifts."

Under these circumstances, the court was not obliged to reiterate the identical thought in the precise language employed in the defendant's request to charge. The matter had been fully covered and there was no error in the refusal to charge as offered.

Point III is aimed at what the court said in reference to intoxication as a defense and it is contended it was erroneous for the court to stress but one element of the crime of murder in the first degree, to wit, the intent to kill, without giving consideration to the other elements made a component part of the crime by statutory enactment.

We think this construction untenable. Taking the charge as a whole, it definitely and emphatically stressed the importance of willfulness, premeditation and deliberation and specified the proof required before the defendant could be convicted of first-degree murder. The intent to kill in no place throughout the charge was so completely divorced from these fundamental elements so as to create error or confusion.

The defendant submitted request to charge No. 23 as follows:

"If you believe that the defendant's mental faculties were prostrated by the decedent's blow, or by intoxication or by mental disorder or disease, or by any other cause whatever, so that he could not form an intent to take life, the defendant cannot be convicted of murder in the first degree. No verdict beyond murder in the second degree can be valid."

The record indicates the court on the defense of intoxication charged as follows:

"I charge you, that if the defendant's mental faculties were so prostrated by the blow of the deceased or by disease or by intoxication or by any other cause whatever, or a combination of any of those causes, so that he was rendered incapable of forming an intent to take the life of the deceased, the defendant cannot be convicted of murder in the first degree, and no verdict beyond murder in the second degree can be found."

█ This was literally a compliance with the request to charge as submitted and we are unable to conceive prejudicial error created by the court's acquiescence in the defendant's demands founded upon an accurate statement of the law.

It is also contended under this point there was error in the court's charge that:

· "Intoxication willfully entered upon will not reduce the degree of the crime from the first degree to second degree, unless it appears by a fair preponderance of the evidence that at the time of the shooting the defendant's mental faculties, by reason of drunkenness, were so prostrated as to render him incapable of forming the specific intent to kill, which is an essential element of murder in the first degree."

This part of the charge, the defendant argues, is contrary to the rule stated in *Brown v. State,* 62 *N. J. L.* 666 (*E. & A.* 1899), that all homicides are presumed to be murder in the second degree and the burden is on the State, if it contends murder in the first degree has been committed, to produce evidence to establish its charge beyond a reasonable doubt. It is asserted the evidence of intoxication was not introduced by the defendant to reduce the homicide from the presumed second-degree murder to manslaughter but to counter the attempt by the State to raise it to first degree. The burden of proving premeditation, deliberation and intent necessary to increase the degree of the offense is on the State and it must assume this obligation and prove these elements beyond a reasonable doubt; the burden, it is urged, is not on the defendant to disprove them by a "fair preponderance of the evidence." So much of the defendant's argument has merit.

█ While the defendant by proper proof must be shown guilty beyond a reasonable doubt, the element of sanity is no part of the State's *prima facie* case on the proof. A similar

doctrine obtains in regard to drunkenness as negativing the ability to form an intent to kill or to prostrate the defendant's mental faculties. *State v. Overton* 85 *N. J. L.* 287 (*E. & A.* 1913).

The evidence shows the defendant, at short range, willfully and deliberately pumped five or six bullets into the body of his victim and the reasonable presumption is that he intended to kill. These facts, with premeditation as indicated by the record, meet the legal requirements of the State as to the burden of proof and raise the homicide to first-degree murder. Murder in the first degree having been proven and established, it is incumbent upon the defendant, if he relies upon intoxication as a defense, to advance facts, if any there be, which will or might rebut the presumption of normal use and control of his faculties. To this extent the defense of intoxication as raised here was an affirmative one and the burden is upon the defendant to establish it by a fair preponderance of the evidence. *State v. Overton, supra; State v. Patton,* 206 *Iowa* 1347, 221 *N. W.* 952 (1928); *State v. Quigley,* 135 *Me.* 435, 199 *A.* 269 (1938).

In *Commonwealth v. Iacobino,* 319 *Pa.* 65, 178 *A.* 823 (1935), the court, after discussing the defense of insanity, said:

"Similarly, when the defense is intoxication, the burden is on the defendant to establish that his intoxication was such as to prevent forming any intent. 'The mere intoxication of the prisoner will not excuse or palliate his offense, unless he was in such a state of intoxication as to be incapable of conceiving any intent.' * * *

" 'The general presumption is that every man is normal and is possessed of ordinary faculties; such defenses as intoxication, insanity and aphasia (or a mind not conscious of its acts) are affirmative defenses, and the burden is on the defendant to establish them.' "

Considering the entire charge, it is apparent that the trial court in using the phrase, "reduce the degree of the crime from the first degree to second degree," had reference not to the initial legal presumption that every homicide is murder in the second degree but rather to the posture of proof as it stood at the conclusion of the State's case, which firmly established

murder in the first degree. This clause, with the full context of the charge and its repeated admonitions as to the requirements which must be met by the State before a first-degree murder verdict could be returned, does not appear to be misleading or confusing to the jury or prejudicial to the defendant.

Point IV refers to the failure to charge the defendant's request No. 12, which reads as follows:

"To find the defendant guilty of a greater offense than murder in the second degree, the State must prove beyond a reasonable doubt, that the defendant wilfully, deliberately and premeditatedly intended to take the life of the deceased."

This request to charge, although varying in language, is practically synonymous with defendant's request No. 19, which is considered and disposed of under Point No. II. The reasons there given are applicable to and dispositive of the issue here raised.

Point V claims error in the sustaining of the State's objection to the taking from the mouth of the defendant the artificial plate for the jury's observation and examination, he contending it had been broken when the decedent allegedly struck him.

The offer to exhibit the plate came eight months after the killing, during which time the defendant had the plate in his possession, and the court ruled that the condition of the plate must be shown in some other way than by the demonstration requested by the defendant.

▮▮▮ Judicial discretion is concerned and there being no proof that the appellant was injuriously affected in a substantial right, no error was committed. The question of remoteness is to be decided by the trial court as a matter of discretion and the determination so made is not reviewable unless it appears there was a palpable abuse of discretion. *State v. Swiller*, 91 *N. J. L.* 345 (*E. & A.* 1917).

Point VI raises the issue as to the effect of a pardon. It is contended error was committed in permitting the State to ask the defendant if he had ever been convicted of crime. The argument proceeds upon the hypothesis that while he was

convicted of murder in Virginia some years earlier, he was pardoned and the effect thereof was to restore him to his former status, "to make the offender a new man, and to acquit him of all penalties and forfeitures annexed to the offense for which he obtains his pardon."

The pardon here granted was conditional. The defendant was convicted in Virginia in 1921 and in 1934 received the pardon in question from the Governor. The conditions were (1) that he conduct himself in the future as a law-abiding citizen, (2) that he report to the trial justice every sixty days for two years, and (3) that if he violate any of the conditions of the pardon or if he again be found guilty of a violation of the penal laws of the state, the pardon would be null and void.

The appellant relies upon *Cook v. Board of Chosen Free-holders*, 26 *N. J. L.* 326 (*Sup. Ct.* 1857); affirmed, 27 *N. J. L.* 637 (*E. & A.* 1858), and *People v. Pease*, 3 *Johns. Cas.* 333 (*N. Y.* 1803), where the language in the quotation above set forth was used. The issue in the *Cook case* was whether a pardon included the right to the return of a fine already paid and the question here under discussion was not directly raised or considered either in it or in the *Pease case*.

In a supplemental brief filed, additional cases were cited: *People v. Hardwick*, 204 *Cal.* 582, 269 *P.* 427 (1928); *Commonwealth v. Quaranta*, 295 *Pa.* 264, 145 *A.* 89 (1928). The *Hardwick case* is authority for the proposition that a prior conviction, even though subsequently pardoned, may be shown and the pardon likewise may be shown when the question of credibility of a witness is raised. In the *Quaranta case* the court said:

"A full pardon releases the punishment and blots out the existence of guilt, so that, in the eyes of the law, the offender is as innocent as if he had never committed the offense."

Even such broad and emphatic language as this, however, did not preclude showing the prior conviction for the purpose of attacking a witness' credibility for the court went on to say:

"We hold, in accordance with the preponderant view, that, whenever one who has been pardoned of a crime such as would ordinarily

affect credibility, *testifies as a defendant in a criminal case,* the judgment of conviction may be inquired into, and the issuance of the pardon may also be shown."

None of these cases afford substantial support to the view expressed by the appellant.

*R. S.* 2:97–13 provides:

"For the purpose of affecting the credibility of any witness, his interest in the result of the action, proceeding or matter or his conviction of any crime may be shown by examination or otherwise, and his answers may be contradicted by other evidence. * * *"

There are no exceptions recited here and it cannot reasonably be asserted the Legislature intended the statute should become inoperative where a pardon was granted as no such provision is contained therein.

The pardon in question having been granted in Virginia, it is logical, in determining its effect, to look first to the law of that state. In *Angles v. Commonwealth of Virginia,* 10 *Grat.* 696 (*Va.* 1853), where a full pardon had been granted, the court said:

"* * * in case of a conviction for felony, the competency is restored, yet it is said the crime still goes to the credibility of the witness. (citing 1 *Phil. Ev.* 35; 2 *Stark. Ev.* 721)

"* * * it relieves the party of all penalties directly annexed to the offense, yet it does very little toward removing the other consequences of the crime. * * *

"In regard to the construction of the terms of a pardon, we find it laid down as a settled rule, that no pardon of a felony shall be carried beyond its express purport. 7 *Bac. Ab.* 411; 2 *Hawk. P. C.* 535, *sec.* 12.

"* * * the effect of a pardon in this state seems more nearly to approach that of satisfying the exigency of the sentence in respect of the corporal punishment imposed, than that of its reversal. * * * the party is restored to his personal liberty, and his competency as a witness is reestablished; but neither takes away the guilt or washes out the moral stain; for as we have seen, the crime still goes to his credibility, of which the jury must judge * * *"

This rule has been adopted in similar terms in many other states. In *Curtis v. Cochran,* 50 *N. H.* 242 (1870), the court set it forth in these words:

"A pardon is not presumed to be granted on the ground of innocence or total reformation. * * * It removes the disability, but does not change the common-law principle that the conviction of an infamous offense is evidence of bad character for truth."

In *State v. Serfling,* 131 *Wash.* 605, 230 *P.* 847 (1924), the same point was raised on appeal and the court, in discussing it, said:

"Nor are we able to see how appellant is in a position to contend that the court should have instructed the jury that the pardon deprived the state of the right to affect the credibility of the witness in the manner indicated, because we have been unable to find that he requested any such instruction. But had such a request been made it would have been proper to refuse it. The authorities generally hold that a pardon does not deprive the state of the right to show a former conviction for the purpose of affecting the credibility of a witness."

Other jurisdictions have followed the same rule in weighing the effect of a pardon.

"Notwithstanding the pardon, for the purpose of affecting the credit of the defendant, the fact of the conviction may, therefore, be brought out either on cross-examination or in rebuttal." *State v. Grant,* 3 *W. W. Harr.* 195, 133 *A.* 790 (*Del.* 1926).

"The fact of his conviction was provable by the witness on cross-examination; it not being necessary to produce the record of his conviction for that purpose. * * *

"The fact that the witness had been pardoned does not change the rule." *Bernard's, Inc., v. Austin, Tex. Civ. App.,* 300 *S. W.* 256 (1927).

3 *Wigmore, Evidence,* states the rule (*3rd Ed.* 1940), § 980, *p.* 543:

"A pardon does not remove the admissibility of the original judgment for the purposes of impeachment; for (unless otherwise expressly declared therein) a pardon does not imply a finding of the innocence of the person convicted."

*Underhill, Criminal Evidence* (*4th Ed.* 1935), § 434, *p.* 889, says:

"The modern rule is that the conviction of an infamous crime * * * may be proved to impeach the credibility of the witness, even though he were later pardoned."

In *State v. Henson,* 66 *N. J. L.* 601 (*E. & A.* 1901), Justice Collins, dissenting on grounds not involved in the case *sub judice,* said:

"At the common law conviction of some offenses worked incompetency to testify, because the convict was considered infamous. Pardon restored competency; but the conviction might still be proved for the purpose of affecting the credit of the witness—for a pardon 'makes not the man always an honest man.' 2 *Hale P. C.* 278; *King v. Crosby,* 5 *Mod.* 15, and the cases collected by Mr. Justice Doe in *Curtis v. Cochran,* 50 *N. H.* 242, 244."

In *Cook v. Board of Chosen Freeholders, supra,* cited by appellant, Cook had been pardoned for rape and sued to recover the fine already paid. Recovery was denied and the then Chief Justice Green said:

"If pardons were granted upon the idea of the innocence of the party pardoned, there would be manifest justice in returning the fine * * * But that is not, in practice, the ground upon which pardons are or ought to be based, nor is it the ground upon which the pardoning power in a government is created and sustained. Pardon implies guilt."

 This case was discussed in the advisory opinion of Chancellor Walker rendered in 1925, *In re N. J. Court of Pardons,* 97 *N. J. Eq.* 555, an informative declaration as to the powers and prerogatives of the Court of Pardons as then constituted. There was no issue to be decided and the question of whether a prior conviction which had been subsequently pardoned could be proved to attack the credibility of a witness was not considered. The Chancellor did, however, stress that a pardon presupposes guilt not innocence. It is the prior guilt of a witness that bears on his credibility; the severity of the punishment imposed or the remission of it is immaterial. Reason and logic seem to support the conclusions of the cited authorities. We accordingly find no error in the action of the trial court in permitting the prior conviction of the defendant to be inquired into.

Point VII involves the alleged inflammatory and improper remarks made by counsel for the State in his summation and

closing statement to the jury, the pith of which was castigating the defendant as a "two-time murderer" and saying, "I say to you, members of the jury, you go into your jury room and do your duty. Don't let this man, twice bloody, go twice unbowed."

There is also a supplemental point designated as No. VII-A which has the same basis, to wit, the remarks of the prosecutor above referred to, with the additional appendage alleging it deprived the defendant of his constitutional rights under the due process clause of the Federal Constitution, relying upon *Lisenba v. People of the State of Cal.*, 314 *U. S.* 219, 62 *Sup. Ct.* 280, 86 *L. Ed.* 166 (1941), where the court held the denial of due process is the failure to observe the fundamental fairness essential to the very concept of justice and holding, in order to declare a denial, it must find the absence of that fairness fatally infected the trial.

The appellant also cites *Berger v. U. S.*, 295 *U. S.* 78, 55 *S. Ct.* 629, 79 *L. Ed.* 1314 (1935), where the court, referring to the conduct of the prosecuting attorney, said:

"But, while he may strike· hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

*State v. Barker*, 68 *N. J. L.* 19 (*Sup. Ct.* 1902), is likewise cited but the opinion of Chief Justice Gummere does not hold as contended for in the appellant's brief. After referring to *People v. Fielding*, 158 *N. Y.* 542, 53 *N. E.* 497 (1899), declaring it to be error to permit appeals by the prosecutor of the pleas to the prejudice of the jurors based upon facts which have not been proved but which rest wholly on his unsupported assertions, the court goes on to say:

"We approve the doctrine of that case, but do not consider it applicable to the matter now under discussion. Nothing appears in the record sent up to show that the prosecutor was not entirely within his privilege in making the remark which was objected to. Where counsel, in his summing up to the jury, confines himself to the evidence in the case, what is said by him in its discussion, by way of comment, denunciation or appeal, affords no ground of exception. *Williams v. Brooklyn Elevated R. R. Co.*, 126 *N. Y.* 96."

In *State v. Lang,* 75 *N. J. L.* 1 (*Sup. Ct.* 1907); affirmed, 75 *N. J. L.* 502 (*E. & A.* 1907); affirmed, 209 *U. S.* 467, 28 *S. Ct.* 594, 52 *L. Ed.* 894 (1908), the prosecutor called the defendant "a monster in his passions, licentious in his desires, beastly in his love, brutal when thwarted and cowardly when caught." Again Chief Justice Gummere, holding this proper comment, said:

"It is necessary for the proper administration of justice that, in the summing up to the jury, counsel shall be given the widest latitude within the four corners of the evidence, and, so long as he confines himself to the evidence, what is said by him in its discussion, by way of comment, denunciation or appeal, affords no ground of exception."

 This seems to be the rationale in *State v. McCormack,* 93 *N. J. L.* 287 (*Sup. Ct.* 1919); affirmed, 94 *N. J. L.* 262 (*E. & A.* 1920); *State v. Cioffe,* 128 *N. J. L.* 342 (*Sup. Ct.* 1942); affirmed, 130 *N. J. L.* 160 (*E. & A.* 1943). The rule seems well defined and clearly stated and we see no reversible error committed here. Although the language used was strong and forceful, there was justification for it in view of the unusual circumstances of the defendant having been convicted of the crime of murder and again being tried for a like offense in a different jurisdiction. The remarks made by the prosecutor were within the limitations of the testimony taken and supported by the evidence. They seem to us to be morally right, logically reasonable and justified by the record.

Point VIII charges error in the court's instruction to the jury as to the credibility of the defendant when it said:

"Such prior convictions of crime are introduced in evidence by the State solely for the purpose of affecting the credibility of the defendant as a witness. And you, the jury, should take into consideration and ask yourselves whether such prior convictions for crime affect the credit of the defendant and, if so, to what extent."

 This, in substance, was urged under Point VI and the disposition there made applies here with equal force. The defendant's objection seems to be that the court had no legal right to submit the prior conviction to the jury but this has

already been disposed of. So too has the suggestion that the pardon should have some ameliorating effect likewise been answered.

Point IX raises the inquiry as to error in submitting to the jury the issue as to whether the alleged murder was perpetrated by lying in wait, the court having charged thereon as follows:

"And the statute, so far as it applies to this case, provides as follows: 'Murder which shall be perpetrated by means of poison or by lying in wait or by any other kind of wilfull, deliberate, and premeditated killing shall be murder in the first degree * * *'"

It is argued the defendant had the opportunity of shooting the deceased on her two trips across the street when loading her car but did not do so, which, as nearly as we can understand the defendant's theory, is proof of the fact that he did not lie in wait. We have difficulty in following the reasoning. At all events, it is said the evidence in the case does not meet the test of lying in wait, citing *Commonwealth v. Mulferno,* 265 *Pa.* 247, 108 *A.* 639 (1919), and *People v. Miles,* 55 *Cal.* 207 (1880).

The factual situation created a question as to whether or not the defendant did not actually lie in wait. He used someone else's car, which we presume was for the purpose of preventing detection, and concealed his objective and he misrepresented the situation to the driver of that car in order to secure his services. This, we think, presents a sufficient question of fact to be decided by a jury, but even if we are in error in this respect, the defendant is not entitled to relief.

Three requests to charge were submitted, Nos. 34, 35 and 36, all dealing with this phase of the case, to wit, lying in wait. These requests were charged *in haec verba,* which was the only mention made on the topic in the charge. Other than this, the court uttered no word about lying in wait excepting to read the statute. Under these circumstances, we see little merit to the theory advanced that lying in wait was erroneously submitted to the jury. The reference to the statute was to clarify the issue for the jury by citing the legisla-

tive enactment pertinent to the issues. The defendant was fully protected by the complete charge made, which has been dealt with in detail in the disposition of other points made herein. *State v. Cordasco*, 2 *N. J.* 189 (1949).

Point X charges the court erroneously misstated the testimony of one of the witnesses as to a statement made by the defendant. The record indicates the defendant had said to Rowlett, the witness:

"Don't tell nobody that you was with me or you seen me tonight."

The court, referring to the facts and to the above, charged that the witness had said:

"Don't tell nobody you were with me or that you saw me do it."

 The inaccuracy complained of consisted of adding the words "do it" to the quotation. How there can be much merit to this in view of the fact there is no dispute but that he did "do it" is beyond our comprehension. Nowhere in the record is it disputed and counsel on appeal frankly admitted there was no defense and that his entire effort was to avoid a conviction of first-degree murder and the imposition of the death penalty. The jury had been specifically instructed they were the judges of the fact and, if the court's recollection did not coincide with theirs, they should disregard the court's statement and follow their own recollection. Indeed, the court said that if this occurred, it was the duty of the jury to disregard the court's expression. Under these circumstances, we are not impressed with the thought that error occurred which injuriously affected the substantial rights of the defendant. *Rule* 1:2–20(b).

Point XI is alleged error in refusing to permit the defendant to answer the following question put to him on direct examination:

"Why did you load this gun and put the bullets in your pocket?"

 It referred to the time of the arrest of the defendant. A witness for the State testified to finding the gun and the

shells on the defendant and counsel reasons that whatever the explanation for the presence of the gun, it was entitled to be given to the jury. On argument of the cause, counsel gave the answer which he expected the defendant to make : he intended to commit suicide.

Suicides in cases of this kind usually are construed as tantamount to a confession or admission of guilt or a consciousness of the impropriety of the act committed, to the extent of attempting retribution by self-destruction. We are unable to appreciate the relationship between the exclusion of such testimony and error which injuriously affected the substantial rights of the defendant. The State, as part of its direct case, proved that the bullets taken from the body of the deceased came from the gun found on the defendant at the time of his arrest and that the shells were of the same type. It was therefore competent on direct and whatever explanation the defendant might give as to the reason or purpose for carrying the weapon at the time in question was wholly irrelevant and immaterial as to the degree of murder involved, which was the only issue raised.

Point XII alleges the verdict of murder in the first degree was contrary to the weight of the evidence. The argument advanced under this topic, as nearly as we can understand it, appears to be totally unrelated to it. Counsel says :

"If the defendant had intended to kill he could have concealed himself in the Park bushes,"

"He had an opportunity to shoot this deceased while he was sitting on the right side of the Rowlett car and as it passed to the left of the deceased's car."

Obviously the murder could have been committed by a different approach, under other circumstances, involving a contrary set of facts and he may have had many opportunities of shooting the deceased of which he did not avail himself, but the bearing this may have upon the situation as it actually developed here is very vague indeed and of little help in evaluating the facts as they occurred.

The facts and circumstances already referred to, plus the vivid climax of the victim being shot six times at a range

so close as to leave "considerable powder smudge," bespeak a brutal, willful killing and make the defendant's guilt evident, complete and proven beyond a reasonable doubt as required by our procedure. There is nothing in the record which makes the verdict appear to be so clearly against the weight of the evidence as to give rise to an inference that it was the result of passion, prejudice or partiality and it must therefore stand as recorded by the jury. *State v. Cordasco, supra.*

The judgment below is affirmed.

HEHER, J. (dissenting). The jury were instructed that "intoxication wilfully entered upon furnishes no excuse for crime and no defense against the consequences which the law denounces against crime," and would not "reduce the degree of the crime from the first degree to second degree, unless it appears by a fair preponderance of the evidence that at the time of the shooting the defendant's mental faculties, by reason of drunkenness, were so prostrated as to render him incapable of forming the specific intent to kill, which is an essential element of murder in the first degree." Again, the Judge said that "the fact that he was capable of forming a specific intent is the fact that establishes the ingredient necessary to the crime of murder in the first degree."

I entertain the view that this constitutes a substantial deviation from the principle of the statute defining murder in the first degree. *R. S.* 2:138–2. Capacity to entertain a design to kill rather than the actual existence of a specific intent to take life in the mind of the accused was thereby laid down as the decisive element of murder in the first degree. Incapacity alone would "reduce" the degree from first to second. Mere mental capability was substituted for the mental operation which is a constituent of murder in the first degree.

At common law, voluntary drunkenness was never an excuse for crime; and evidence of drunkenness falling short of a proved incapacity in the accused to form the intent necessary to constitute the crime, "and merely establishing that his mind was affected by drink, so that he more readily gave way to some violent passion, does not rebut the presumption

that a man intends the natural consequences of his acts."
*Director of Public Prosecutions v. Beard* [1920] *A. C.* 479.
Indeed, the early common law regarded voluntary drunkenness as an aggravation of the crime. *Co. Litt.* 247a. At common law, there is no distinction of degree in murder. Malice, *i. e.,* an intent to do bodily harm, is presumed; and the burden is on the accused to show circumstances of alleviation, excuse, or justification. *State v. Zeller,* 7 *N. J. L.* 220 (*Sup. Ct.* 1924); *Brown v. State,* 62 *N. J. L.* 666, 703 (*E. & A.* 1899); *State v. Silverio,* 79 *N. J. L.* 482 (*E. & A.* 1910); *Allen v. United States* (1896), 164 *U. S.* 492, 17 *S. Ct.* 154, 41 *L. Ed.* 528. But a killing which constitutes murder at common law or under the statute (*R. S.* 2:138–2) is presumed to be murder of the second degree, after the presumption of innocence is dissipated by a finding of guilt of a criminal homicide; and the burden is cast upon the State to prove beyond a reasonable doubt the specific intent to take life and the premeditation and deliberation constituting the elements of murder in the first degree. *Warner v. State,* 56 *N. J. L.* 686 (*E. & A.* 1894); *Wilson v. State,* 60 *N. J. L.* 171 (*E. & A.* 1897); *Brown v. State,* 62 *N. J. L.* 666 (*E. & A.* 1897); *State v. Mangano,* 77 *N. J. L.* 544 (*E. & A.* 1909); *State v. Leo,* 80 *N. J. L.* 21 (*Sup. Ct.* 1910); *State v. Kubaszewski,* 86 *N. J. L.* 250 (*E. & A.* 1914); *State v. Cooper,* 2 *N. J.* 540 (1949). A specific intent to take life is not, without more, proof of deliberation and premeditation within the intendment of the statute. *State v. Bonofiglio,* 67 *N. J. L.* 239 (*E. & A.* 1901). It would seem to be axiomatic that there cannot be a lawful conviction of murder in the first degree unless upon the whole evidence these constituents are established beyond a reasonable doubt.

I am not unmindful of the reasoning of the majority in the *Wilson case, supra,* with respect to the defense of intoxication. I do not think it takes into account the effect of the statute defining murder of the first degree upon the common-law conception of intoxication as a defense. In that case, Mr. Justice Van Syckel said: "So long as the mind of the criminal is capable of conceiving the purpose to kill, he must be

held to the responsibility of one who is sober, and that is the language of the cases upon this subject." But a sober man is not chargeable with murder in the first degree unless he had actually formed an intent to take life and had executed the intent with deliberation and premeditation. His ability to "conceive" the purpose to kill is not enough; he must in fact entertain a design to kill. Obviously, mental capability to form an intent to kill and the actual intent are not one and the same. Justice Van Syckel invoked a Georgia case (*Marshall v. State,* 59 *Ga.* 154), holding: "To be too drunk to form the intent to kill, the slayer must be too drunk to form the intent to shoot." This, too, is an arbitrary standard that ignores the principle of the statute. It suggests that the shooting itself is conclusive of the intent to kill; and this, of course, is not the law. *State v. Deliso,* 75 *N. J. L.* 808 (*E. & A.* 1908) ; *State v. Kubaszewski, supra; State v. Lynch,* 130 *N. J. L.* 253 (*E. & A.* 1943).

Can it be said with any degree of reason and logic that the State has sustained the burden of proof if, upon the evidence adduced either by the State or by the accused, there arises a reasonable doubt as to the existence of the specific intent to take life requisite to murder of the first degree under the statute? Is not the crucial inquiry in this regard the actual existence of the intent to kill at the time of the shooting? This is plainly the rule of the statute; and the application of the common-law conception of intoxication as a defense to crime does not serve the legislative design. In a word, if the evidence as to intoxication raises a reasonable doubt as to the existence of a specific intent to take life, the State has not borne the burden of proving this ingredient of murder in the first degree. Intoxication is not a defense to murder. But it may be shown to negative the existence of the state of mind and the mental operation requisite to murder in the first degree as defined by the statute, just as other circumstances are introducible to that end; and if the evidence in that behalf engenders a reasonable doubt as to the existence of any of the elements of that offense, the burden of proof is not sustained. This is the principle of the *Warner case, supra.* There, the

old Court of Errors and Appeals ruled that an instruction according to the accused the benefit of a reasonable doubt "as to any fact the State was bound to prove" necessarily involved "the proposition that if there was a reasonable doubt whether drunkenness deprived the defendant of this intent to kill, he could not be convicted of murder in the first degree." Mr. Justice Reed said: "Design to kill was a fact. A reasonable doubt as to the existence of that fact might spring out of the drunkenness of defendant, or out of any other circumstance or combination of drunkenness with other circumstances." The age-old rule of law barring intoxication as a defense to crime does not justify the substitution of bare mental capability for actual intent in the application of the statutory principle.

In the case of *State v. Quigley,* 135 *Me.* 435, 199 *A.* 269 (1938), cited in support of the conclusion here, there was a conviction of assault, by a shotgun with intent to kill; and the question was whether there was error in the denial of a motion for a directed verdict of not guilty. In holding that the question of intent was one of fact, the court said: "In this century the authorities agree that when in a criminal trial, where intent to do the criminal act charged must be proven, and insanity is not pleaded, but voluntary intoxication whether from alcohol or drugs, the jury, if not satisfied of the presence of the specific intent, may find the respondent guilty of a lesser crime rather than 'not guilty.'" And in *State v. Patton,* 206 *Iowa* 1347, 221 *N. W.* 952 (1928), also cited to the same end, there was a conviction of larceny; and it was held that where intoxication is pleaded as a defense, the burden is upon the accused to show, "not that he was innocent, but that he was so affected thereby as to be unable to form a 'criminal intent.'" In those cases, the principle invoked was that intoxication is not a defense to crime—a principle not applicable where, as here, the inquiry is as to the existence of the state of mind and mental operation made the constituents of murder in the first degree. Compare *Hopt v. People of Utah,* 104 *U. S.* 631, 26 *L. Ed.* 873 (1881).

But here the jury were told that wilful intoxication would not "reduce" the crime from murder of the first to the second degree, unless the accused proved that his mental faculties were "so prostrated" by drunkenness as to render him "incapable" of forming the requisite specific intent to take life. In justification, my brothers say that at the close of the State's case, a wilful, deliberate and premeditated killing had been "proven and established" and the homicide "raised to first-degree murder," and the burden was then cast on the accused to "advance facts" to "rebut the presumption of normal use and control of his faculties," and thus to sustain the defense of intoxication by a preponderance of the evidence. The verb "reduce," it is said, had reference "not to the initial legal presumption" of murder in the second degree, but rather to the posture of the proof at the conclusion of the State's case, "which firmly established murder in the first degree."

We have no way of knowing what the term "reduce" signified to the lay minds of the jury. They were not told that it had relation only to the state of the evidence when the State had presented its case, as is now suggested. Yet in that view, the instruction shifted the burden of proof on the crucial elements of murder in the first degree. It called upon the jury, as the passage is read, to determine whether the evidence at the close of the State's case had established a wilful, deliberate and premeditated murder, and then, if they settled that inquiry in the affirmative, to decide whether the accused had proved by a preponderance of the evidence that, by reason of drunkenness, he was "incapable" of forming the specific intent to take life already found as a fact against him. It would seem to be elementary that the issue of a wilful, deliberate and premeditated murder could not be resolved except upon a consideration of all the evidence. Where it is incumbent on the jury first to find whether the proofs adduced by the State alone generate the conviction beyond a reasonable doubt of a specific intent to kill and its execution with deliberation and premeditation, and the issue is resolved in the affirmative, the burden of proof *ex necessitate* shifts to the accused, to overcome that judgment. And, as to the defense

of intoxication, it could be overthrown only by proof that drunkenness had rendered him "incapable" of forming the specific intent to take life which the jury had then found he had in fact entertained. Certainly, "reduce" hypothesizes murder in the first degree and thus puts the burden of proof on the accused; the word is not susceptible of any other meaning.

First-degree murder is a crime of the first magnitude, and the interests of society demand punitive measures commensurate with its character; but it is no less important that one accused of an offense of such gravity be accorded all the basic safeguards of due process designed to secure him against an adjudication of guilt unless all the ingredients of the crime are proved beyond a reasonable doubt. The statute defines the offense; and the criterion of guilt is the existence in fact of the statutory elements, with the burden of proof upon the State.

I would reverse the judgment and award a *venire de novo*.

*For affirmance*—Chief Justice VANDERBILT, and Justices CASE, OLIPHANT, WACHENFELD, BURLING and ACKERSON—6.

*For reversal*—Justice HEHER—1.