**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4239-17T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DANIEL J. MARKS,

     Defendant-Appellant.

_____

Submitted April 3, 2019 – Decided April 30, 2019

Before Judges Koblitz, Currier and Mayer.

On appeal from Superior Court of New Jersey, Law Division, Camden County, Indictment No. 17-03-0575.

Joseph E. Krakora, Public Defender, attorney for appellant (Michael Timothy Denny, Assistant Deputy Public Defender, of counsel and on the brief).

Mary Eva Colalillo, Camden County Prosecutor, attorney for respondent (Jason Magid, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Daniel J. Marks appeals from his March 23, 2018 conviction after trial of third-degree theft of services over $500, N.J.S.A. 2C:20-8(a) and N.J.S.A. 2C:20-2(b)(2)(a), by driving his girlfriend's car, without an E-ZPass transponder, through an E-ZPass lane 224 times in six months. The judge sentenced defendant to five years of probation, $1,210 in restitution and 125 hours of community service. Because the judge incorrectly instructed the jury over defendant's repeated objection, we reverse.

In 2016, a 2011 Hyundai Elantra with New Jersey plates drove through the E-Z Pass lanes of the Ben Franklin and Walt Whitman bridges a total of 224 times without an E-ZPass transponder. Each time, the tollbooth camera photographed the license plate—but not the driver—and a notice of violation was mailed to the car's registered owner, defendant's girlfriend.

Defendant lived with his girlfriend, her father, sister, brother, two nieces, and defendant's daughter. Delaware River Port Authority Police Corporal Richard Zappile testified that when he called defendant's girlfriend on November 23, 2016 regarding the toll violations, she denied any knowledge and said her boyfriend, who drove the car, would call the officer back. Defendant called and agreed to meet the officer. Shortly after this telephone conversation,

Zappile wrote a report noting that defendant admitted on the telephone that "he was responsible for all the violations," with no further specificity.

Defendant gave a statement at the police station a week later on November 30 and was arrested; however, after a Miranda[1] hearing in September 2017, the court suppressed the contents of that police station statement. The suppression order did not cover the telephone conversation, which the court held admissible. Testifying at the Miranda hearing, Zappile described the telephone conversation as briefly as he had in his original written report.

Upon receiving a subpoena within a month of trial—and over a year after he wrote the report—Zappile drafted a supplemental report, which added details. He reported that defendant admitted on the telephone that he alone had driven the car and his girlfriend had no part in the violations; he threw away all the violation notices that arrived in the mail; and he drove through the E-ZPass lanes without a transponder "because it was easy." Zappile also put in this supplemental report that defendant arrived at the police station on November 30 in his girlfriend's Elantra.

At trial, defendant's girlfriend confirmed that in 2016 she lived with defendant, who drove her to and from Cherry Hill, where she worked five days

---

[1]  Miranda v. Arizona, 384 U.S. 436 (1966).

A-4239-17T2

a week from 8:00 a.m. to 4:30 p.m. She stated that defendant had possession of her car during the day, but her other family members also used it at times. She also testified that defendant admitted to her that he drove through the E-ZPass lane without a transponder, but only "[a] couple of times."

The defense theory was that one or more of his girlfriend's relatives living with her committed the violations. The defense also argued that, contrary to Zappile's supplemental report, defendant never admitted to committing the violations "because it was easy" or throwing out the notifications. Defense counsel argued:

> All we know is that [defendant] wanted to take responsibility for his girlfriend . . . and he came to the police station, he wanted to pay the tickets, and he told the officer please don't charge my girlfriend. He did not want [her] to get in trouble.

To discredit Zappile's account of the telephone conversation, the defense highlighted that neither the officer's initial report nor his testimony at the Miranda hearing mentioned defendant's alleged admission to throwing out the notices and committing the violations "because it was easy." He only mentioned these admissions in his supplemental report, which he wrote in preparation for trial over a year after the telephone call, and again in his in-court testimony.

Zappile also brought up the suppressed station house statement in front of the jury, although the court did not allow Zappile to describe the statement.

Because defendant contested Zappile's recent version of the unrecorded telephone conversation, the judge instructed the jury about the unreliability of such statements. At the Rule 1:8-7 charge conference, the judge read to counsel his proposed jury charge. Neither attorney had a written copy, but the judge assured counsel he would provide the final draft the next day, before he delivered it to the jury. The proposed instruction contained an error: it quoted Zappile as testifying that defendant admitted to committing the crime "because it was easy" at the police station—instead of on the telephone.

The judge read the proposed charge to counsel:

> Corporal Richard Zappile of the Delaware River Port Authority testified . . . he called the registered owner of the motor vehicle depicted in the photograph and spoke to a woman who identified herself as [defendant's girlfriend], the owner of the motor vehicle. [She] said her boyfriend drives the vehicle and she would have him call the officer. Approximately two hours later the officer received a call from a man who identified himself as [defendant]. The individual indicated he was responsible for the violations as he ha[d] driven the car. When he continued to speak about the various violations, the officer indicated [defendant] should come to the police department and made a date and time for him to come in. At the agreed upon time, the defendant . . . drove to the police department, identified himself by producing his driver[']s license and met with

the officer. At th[at] time in the conversation the defendant admitted he was the driver of the vehicle in the photographs, his girlfriend had nothing to do with this. He indicated he continued to drive through E-ZPass lanes without paying because it was so easy.

After the judge read the proposed charge, defense counsel objected:

[DEFENSE COUNSEL]: I believe you said that there was a conversation with [defendant] and the corporal . . . [at] the police station.

THE COURT: That's exactly what the officer said.

[DEFENSE COUNSEL]: Well, that should be stricken because --

THE COURT: Why? That's a -- that's an oral statement.

[DEFENSE COUNSEL]: He did not go into -- he did not discuss -- he did not testify that there was a conversation at the police station.

THE COURT: Counsel, isn't that when he said that he -- that he remembered he said that he drove through because it was easy?

[DEFENSE COUNSEL]: No. That was during the telephone call.

[THE STATE]: That's correct, Judge.

THE COURT: Okay. Fine. I'll change that to the telephone calls.

6

Upon reviewing the final draft of the charge the next day, counsel discovered the judge had not corrected the error. Defense counsel again objected that the proposed jury charge should relate only to the telephone conversation, not the suppressed statement at the police station.

The judge replied to the defense, "Counsel, this is exactly the way I read it to you yesterday. There was no objection yesterday." He went on, "All that this is doing is giving a sequence to the jury as to when the conversations may have occurred, and there's nothing that isn't part of the record here." Defense counsel clarified that she had, in fact, objected the previous day. The trial judge nonetheless stated he did "not see how this is objectionable in any way, it's just giving [context] to what had occurred, in this case, and testimony at trial." The judge delivered the jury instruction with the error uncorrected, misstating Zappile's testimony. The defense renewed its objection after the judge delivered the charge.

Defendant raises the following single issue on appeal:

> POINT I: THE COURT ERRED BY GIVING A FACTUALLY INACCURATE INSTRUCTION ABOUT DEFENDANT'S ORAL OUT-OF-COURT STATEMENT, EVEN THOUGH THE INACCURACY WAS FLAGGED BY DEFENSE COUNSEL MULTIPLE TIMES AND ACKNOWLEDGED BY THE STATE AS BEING WRONG.

Where a defendant timely objects to a judge's erroneous presentation of the facts, we review under the harmless error standard—that is, whether a real possibility exists that the error "might have contributed to the conviction." State in re A.S., 203 N.J. 131, 153 (2010) (quoting State v. Sanchez, 129 N.J. 261, 278 (1992)). Under this standard, we should reverse a conviction unless we can "say with assurance" that the error "did not influence [the fact-finder's] conclusion of guilt." State v. Miller, 64 N.J. Super. 262, 265 (App. Div. 1960); State v. Bankston, 63 N.J. 263, 272-73 (1973) ("We cannot say the proof was so overwhelming as to foreclose a real possibility that the jury gave decisive weight to the improper hearsay testimony."). An error is not harmless merely because the evidence suffices to convict or to persuade the appellate court of the defendant's guilt. State v. Zwillman, 112 N.J. Super. 6, 20 (App. Div. 1970).

Because "proper charges to a jury are essential for a fair trial," a charge that "tend[s] to confuse or mislead" warrants reversal "where the jury outcome might have been different had the jury been instructed correctly." Velazquez ex rel. Velazquez v. Portadin, 163 N.J. 677, 688 (2000) (quoting State v. Green, 86 N.J. 281, 287 (1981)).

The judge erred while instructing the jury to regard defendant's alleged telephone statement with caution. State v. Kociolek, 23 N.J. 400, 421 (1957),

which applies to testimony concerning a defendant's out-of-court oral statement, requires a warning to the jury about the general lack of reliability of second-hand oral statements. A Kociolek charge should stress the inherent dubiousness of such evidence, not because of concerns of strong-arming but due to a witness's "generally recognized risk of inaccuracy and error in" recalling what another person said. Ibid.; State v. Baldwin, 296 N.J. Super. 391, 400 (App. Div. 1997); Model Jury Charges (Criminal), "Statements of Defendant" (rev. June 14, 2010).

While the jury charge here warned about the dangers of crediting second-hand oral statements, it simultaneously bolstered Zappile's credibility by mistakenly placing defendant's alleged admissions at the police station, rather than on the telephone. This misstatement occurred after the officer improperly raised the issue of a station house statement before the jury, thus potentially confusing the jury.

Defendant challenged Zappile's account not only as a second-hand oral report but also as contradicting Zappile's own previous written and oral accounts. The first report referenced the telephone conversation in a single sentence: "[defendant] contacted me via telephone and advised me he was responsible for all the violations." Zappile testified similarly at the Miranda hearing. Only after the station house statement was suppressed, in preparation

for trial over a year after the telephone conversation, did Zappile add information.  He explained that the new facts only occurred to him when he received the trial subpoena.  This inconsistency was enough to call into question Zappile's credibility, but the jury needed the assistance of clear jury instructions, because the jury was unaware that the officer could be embellishing the telephone conversation to compensate for the suppression of defendant's station house statement.

The version of events as the judge represented them had a substantial capacity to prejudice defendant's case.  While the evidence—including defendant's undisputed remark on the telephone about taking responsibility for the violations—was sufficient to convict him, the defense advanced a different theory explaining that evidence—namely, that defendant assumed responsibility for what someone else had done.  A reasonable doubt exists that the jury discredited this alternative version in part because it believed defendant admitted to committing all of the violations "because it was easy" and to throwing out all of the notices, which implied an admission of his own guilt for all violations.

The judge did instruct the jurors to disregard the court's recital of the evidence where it differed from their own recollection.  Courts have often relied

A-4239-17T2

on similar statements about the jury's fact-finding duty in declining to reverse because a judge misstated the facts.  See State v. Feaster, 156 N.J. 1, 72 (1998); State v. Conklin, 54 N.J. 540, 547 (1969); State v. Tansimore, 3 N.J. 516, 538 (1950); State v. Kennedy, 135 N.J. Super. 513, 527 (App. Div. 1975); State v. Long, 67 N.J. Super. 207, 211-12 (App. Div. 1961).  However, those decisions differ from this case in two significant respects.

First, in several of those decisions the appellate court applied the plain-error standard because the error was not raised in the trial court, permitting reversal only where an error could clearly produce an unjust result.  See Feaster, 156 N.J. at 72; Conklin, 54 N.J. at 547; Long, 67 N.J. Super. at 212.  Thus, the ample incriminating evidence in those cases made it unlikely that a judge's error prejudiced the outcome.  Second, those cases involved mostly trivial misstatements of fact that did not go to the heart of the defense.  See Tansimore, 3 N.J. at 538; Kennedy, 135 N.J. Super. at 527.

Here, by contrast, because defense counsel preserved the issue, we review for harmless error; therefore, the relevant question is whether a reasonable doubt exists that the misstatement confused the jury and affected their own recollection of the facts.  State v. Macon, 57 N.J. 325, 338 (1971).  A reasonable doubt exists whether the error contributed to the jury's decision.  This is particularly true

11

because, to convict defendant of a third-degree theft, the State had to prove beyond a reasonable doubt that defendant accumulated more than $500 worth of toll evasions while he was driving the car.[2] N.J.S.A. 2C:20-2(b). A reasonable doubt that defendant drove through the E-ZPass enough times to avoid $500 in tolls should have resulted in an acquittal.

The additional admissions, instead of merely showing that defendant "took responsibility"—which he explains as a chivalrous attempt to shield his girlfriend—tied defendant to all of the 224 violations, because he allegedly admitted to discarding each notice mailed to the house. See Kern, 325 N.J. Super. at 444 ("To dismiss a confession of guilt as 'not critical in light of the other fact findings' is, we think, contrary to human nature.").

Reversed and remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[2] Prior to trial another judge denied defendant's motion to dismiss the indictment for failure to charge a crime. Defendant contended the behavior charged amounted to a civil wrong only. He does not appeal from this July 14, 2017 order.